[Crim. No. 2102.   In Bank.—December 13, 1917.]

THE PEOPLE, Respondent, v. WONG HING, Appellant.

CRIMINAL LAW — MURDER — EVIDENCE — SUFFICIENCY OF EVIDENCE.—In this prosecution for murder, the evidence is held sufficient to justify a verdict of murder in the first degree.

ID.—MURDER—TRIAL—CONDUCT OF DISTRICT ATTORNEY UNPREJUDICIAL—OPENING STATEMENT.—In the prosecution of a Chinese for murder of a fellow-countryman, where the district attorney, in his opening statement, informed the jury that he expected to show that on the afternoon of the murder, and a few minutes before it occurred, a so-called highbinders' or Chinese tong war was begun, it cannot be said that the district attorney was guilty of misconduct because he failed to produce such evidence, there being nothing in the record tending to show that the statement was made in bad faith or without intention of trying to support it by evidence.

ID.—MURDER — APPEAL — HARMLESS ERROR ON CROSS-EXAMINATION.—Where, in a prosecution for murder, the defendant, who had testified that he was a member of the "Bing Kong Tong," was asked on cross-examination: "How long have you belonged to this Bing Kong Tong, or society of highbinders, as it is commonly known?" but the district attorney, on objection being made, recast the question, without waiting for a ruling by the court, and asked, "How long have you belonged to that Tong?" although the original question was highly improper, the defendant was not prejudiced, especially in view of the fact that no request was made by the defendant's counsel that the trial court admonish the jury to disregard the question.

ID.—MURDER—EVIDENCE—ADMISSIBILITY.—It was not prejudicial error on the trial of a Chinese for murder to admit evidence as to the meaning of Chinese characters found on a badge found in defendant's possession when arrested, which when translated and read together with certain English words on the same badge indicated that, as a delegate from the San Francisco Bing Kong Tong, the defendant had recently attended a meeting of a Seattle branch of the same society at the dedication of a new building.

ID.—MURDER—VIEWING PREMISES—DISCRETION OF COURT.—Under section 1119 of the Penal Code, an order of the court allowing the jury to view the place in which the offense is charged to have been committed or in which any other material fact occurred is a matter committed solely to the discretion of the court, and where a plat, correctly describing the premises and objects surrounding the scene, was used by the witnesses in testifying, there was no abuse of discretion in refusing to make an order permitting the jury to view

the scene, and it is difficult to conceive of a case where the facts would justify a reversal for an abuse of such discretion.

ID.—MURDER—INSTRUCTIONS—ACCESSORIES.—Where in a prosecution for murder by shooting, the character of the evidence and reasonable inferences to be drawn therefrom were such that the jury might have adopted either the theory that the defendant fired the fatal shots, or the theory that, while not guilty of so doing, he was present, aiding and abetting the acts which deprived the deceased of life, it was proper to instruct the jury as to both theories.

ID.—MURDER — INSTRUCTIONS — AIDING AND ABETTING — COMMONPLACE WORDS—NO NECESSITY FOR DEFINITION.—In instructing a jury as to accessories, it was not error to fail to define the term "aiding and abetting," which are commonplace words deemed to be understood by jurors.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order refusing a new trial. Frank H. Dunne, Judge.

The facts are stated in the opinion of the court.

T. M. O'Connor, and Harold C. Faulkner, for Appellant.

U. S. Webb, Attorney-General, and John H. Riordan, Deputy Attorney-General, for Respondent.

VICTOR E. SHAW, J., *pro tem.*—The grand jury of the city and county of San Francisco returned an indictment charging defendant with the crime of murdering a fellow-countryman known as Nung Yu. Upon trial he was convicted of murder in the first degree, followed by judgment of the court sentencing him to execution as provided by law.

From this judgment and an order of court denying his motion for a new trial defendant appeals.

The alleged errors upon which he bases his claim for a reversal are: First, insufficiency of the evidence to justify the verdict; second, misconduct of the district attorney; third, rulings of the court in admitting and rejecting testimony; and, fourth, erroneous instructions given the jury.

As to the first assignment of error, it appears that at the time of the killing, about 1:30 P. M. on March 5, 1917, the deceased, Nung Yu, was engaged in conducting an undertaking business in San Francisco, at 750 Pacific Street, adjoining which on the west was a vacant lot, through which de-

ceased had access from the front entrance of his storeroom to a house in the rear thereof occupied by him and his family as a residence. Thomas J. Wright, a witness called on behalf of the prosecution, in substance testified that shortly before the commission of the crime he was with Nung Yu, in the latter's store, when defendant, accompanied by another Chinaman, leaving a third outside, entered and, in English, asked who was the proprietor of the place, to which deceased replied, "I am the proprietor"; that "Yu seemed to be getting a little nervous"; that about the same time some shooting occurred on Stockton Street, when Yu ran out of his place, going through the vacant lot toward his residence. "He walked back through the vacant lot. It is something over 120 feet or more, and as he turned to walk through the vacant lot he started back, and at that time they commenced opening fire"; that he saw defendant shoot deceased about four times in the back; that deceased fell and, raising his hand up, said: "I don't belong to any society"; that after the shooting defendant ran through the vacant lot, throwing the gun down, and went out through that lot over to Broadway, where he was captured by an officer and brought back. In reply to the question, "How many men were shooting at the deceased in that vacant lot?" witness said: "I only saw that man doing the shooting. There were three men, three Chinamen, but two was around him. But I seen that young man who pumped him in the back four times. He was the one that asked was he the proprietor; he was the one that made the finishing touch." Both upon his direct and cross-examination the witness admitted that, due to the occurrence, he was somewhat excited, but is positive that defendant was the Chinaman who came into Yu's store and inquired for the proprietor, and that some ten minutes later he saw the same man, with another Chinaman, both of whom were engaged in the shooting of Yu. On cross-examination the witness said: "It is a pretty hard matter for me to say that he is the one that made the fatal blow, but I say he was engaged in the shooting." Other testimony of this witness is to the effect that, after deceased was down, defendant stood within eight or ten feet of him and fired four or five shots into his body.

The wife of deceased also witnessed the shooting and testified that the defendant fired one shot when her husband, who was in the vacant lot, fell down and, partially rising, said: "I belong to no Tong. My name is Nung Yu"; that defendant fired more shots and then ran past her doorway; that as to the identity of defendant she was positive that he was the man who did the shooting. Another eye-witness, Louis Bergamaschi, testified that while in his saloon, some two hundred feet distant but in plain view of the place where the shooting occurred, he heard some shots and, looking out through the rear window, saw deceased lying on the ground, surrounded by three Chinamen, two of whom started to run away and the other, said by the witness to be defendant, fired three shots at deceased, threw the gun away, and then ran through an alley past his saloon to Broadway Street, upon which the saloon fronted; that witness ran to the front door of his saloon and saw the three Chinamen separate, the defendant crossing Broadway, where Officer Collins, whose attention was attracted by the witness blowing a police whistle, arrested him. In response to the question, "Was it this Chinaman [defendant]?" the witness said: "Yes, it was this fellow. I didn't know him before, but I see him when he was coming, and I paid attention right where he was going, and Mr. Collins he brought him back. . . . I didn't lose him with my eyes; I saw him all the time." Further testifying, the witness said: "I could not prove that he is the man that done the shooting, but he was one of the men in the bunch. . . . I know he is one of the men of the three, but I don't know if he was the man that was shooting." Upon arresting defendant, Officer Collins, taking him by the arm, conducted him to where Nung Yu was lying, when defendant said: "I didn't do it." In applying the handcuffs, witness noticed a powder mark on defendant's right hand and asked defendant, "How did you get this?" to which defendant replied: "You done, you done it." Again defendant said: "You did it, you did it." The bullets which caused the death of deceased were of 32-caliber size and a 32-caliber pistol containing six shells, five of which were empty, and its condition evidencing its recent discharge, was, a few minutes after the tragedy, found some twenty-five feet from where Yu fell when he was shot. Afterward Officer Richards went to the

room occupied by defendant and discovered a box of 32-caliber cartridges, such as were used in said gun, from which six shells were missing. This room was occupied, besides defendant, by two other Chinamen, one of whom testified that the cartridges and a 32-caliber pistol had been left with him by a cousin who had gone to China, and he had removed six cartridges from the box to load the pistol. Defendant explained his presence in the vicinity upon the theory that he was hunting a carpenter-shop located near there, the name and address of the proprietor of which he had in his possession when arrested. The testimony of the eye-witnesses, differing somewhat as to minor details, which under the circumstances was most natural, together with incriminating circumstances, the explanation of which failed to satisfy the jury, clearly justified the conclusion that if the defendant did not fire the shots himself, he, nevertheless, was a party to the commission of the crime and aided and abetted therein. Indeed, upon the evidence it is difficult to see how the jury could have arrived at any verdict other than the one rendered.

An assignment of misconduct of the district attorney is predicated upon the fact that in his opening statement to the jury he said: "We expect to show that on the afternoon of the fifth day of March, 1917, about 1:20, a so-called high-binders' war or Chinese tong was begun in this city." There is evidence, though slight, from which an inference might be drawn that the killing of Yu was the result of a tong feud. Conceding, however, that no evidence was offered in support of the statement so made to the jury, there is nothing in the record tending to show that it was made in bad faith or without intention of trying to support it by evidence. In the absence of such showing it cannot be said the district attorney was guilty of misconduct because he failed to produce such evidence. (*People* v. *Gleason*, 127 Cal. 323, [59 Pac. 592]; *People* v. *Searcey*, 121 Cal. 1, [41 L. R. A. 157, 53 Pac. 359].)

It appearing from defendant's testimony that he was a member of the Bing Kong Tong, he was, on cross-examination, asked: "Now, how long have you belonged to this Bing Kong Tong or society of highbinders, as it is commonly known?" to which defendant interposed an objection upon the ground that it was incompetent, irrelevant, and immaterial. Without waiting for a ruling of the court thereon, the attorney for the prosecution, impliedly conceding the impropriety

thereof, recast the question and asked: "How long have you belonged to that Tong?" No evidence had been offered that the Bing Kong Tong, of which defendant was a member, was a society of highbinders; and hence the question containing the implication was highly improper and should not have been put to the witness. Nevertheless, we are unable to perceive, under the circumstances, how defendant could in any event have been prejudiced thereby. Moreover, no request was made by defendant's attorney that the trial court admonish the jury to disregard the question, in the absence of which, where such admonition may cure the error, it has been held this court will not consider the same. (*People* v. *Metzler,* 21 Cal. App. 80, [130 Pac. 1192]; *People* v. *Shears,* 133 Cal. 154, [65 Pac. 295]; *People* v. *Bradbury,* 151 Cal. 675, [91 Pac. 497].)

Neither was it prejudicial error to receive evidence as to the meaning of Chinese characters appearing on a badge found in defendant's possession when arrested. As translated these characters were: "Congratulations on the Dedication," and then in English, "B. K. T. of San Francisco, California," followed in Chinese by "San Francisco Bing Kong Tong Representative, Wong Yak Shu." Defendant's possession of the badge with these characters is accounted for in the fact, as shown by him, that he had, as a delegate from the San Francisco society, recently represented it at a meeting of the Seattle branch in the dedication of a new building.

While the shots fatal to defendant were fired from a 32-caliber revolver, it appears also that a 38-caliber revolver, found at the place where the shooting occurred, was used by one of the persons engaged in attacking Yu, one shot from which took effect in his thigh, and concerning which witness Davis stated it contained five empty shells and one loaded. The revolver, however, as appears from the record, was not offered in evidence, but, at the request of the prosecution, merely marked as an exhibit. Hence there is no ground for appellant's contention that the court erred in admitting this revolver in evidence, since it was not so admitted.

Error is also predicated upon a ruling of the court refusing to make an order granting defendant's request that the jury be permitted to view the premises where the offense was committed. Section 1119 of the Penal Code provides:

"When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, it may order the jury to be conducted in a body . . . to the place. . . . " Under this provision the making of such order is a matter committed solely to the discretion of the court, and it is difficult to conceive of a case in which the facts would justify a reversal for an abuse of such discretion. (*People* v. *Maupins,* 30 Cal. App. 393, [158 Pac. 502] ; *People* v. *Howard,* 28 Cal. App. 180, [151 Pac. 754].) In *People* v. *Fitzpatrick,* 80 Cal. 538, [22 Pac. 215], it is said: "Sending a jury out to view premises, even when clearly within section 1119 of the Penal Code, is a hazardous proceeding, and frequently leads to difficulties; and it would be well for trial courts not to make use of the power therein given except in cases which seem to imperatively call for it." In the case at bar a plat, correctly delineating the premises and objects surrounding the scene where the offense was committed, was used by the witnesses in giving their testimony, and there is nothing in the record which in the slightest degree discloses any abuse of discretion on the part of the court in making the order complained of.

Appellant challenged the giving to the jury of an instruction as follows: "It is the law, gentlemen, that all persons concerned in the commission of a crime, whether they directly commit the act constituting the offense or aid and abet in its commission, or not being present, have advised and encouraged its commission, are principals in any crime so committed. So that in the case before you, if you are satisfied beyond all reasonable doubt that the defendant here directly committed the crime charged, or aided and abetted in its commission, or, not being present, advised and encouraged its commission, you will be justified in finding him guilty as a principal." The attack thereon made is that, appellant conceding the correctness of the instruction as an abstract proposition of law, insists it is inapplicable to the facts established and theory upon which the case was tried. By the provisions of section 1127 of the Penal Code, it is made the duty of the court to charge the jury as to all matters of law necessary for their information. Reference to the *résumé* of the evidence hereinbefore made discloses two theories, either of which, if found correct, justified the verdict rendered.

That deceased was attacked by three men, one of whom was defendant, clearly appears, and according to the positive testimony of the wife of deceased, he fired the fatal shots. But concede that her testimony, notwithstanding its support, was deemed insufficient proof of the fact, other testimony, that of Wright and Bergamaschi, if believed, together with incriminating circumstances established, constituted proof inconsistent with any theory other than that he was there present aiding and abetting in the commission of the crime. The character of the evidence and reasonable inferences to be drawn therefrom were such that the jury in arriving at its verdict might have adopted either of the two theories; (1) that defendant fired the fatal shots; or (2) that while not guilty of so doing, he was present aiding and abetting in the acts which deprived Nung Yu of his life; hence, in charging the jury it was proper for the court to instruct it as to both theories. The term "aiding and abetting" are commonplace words, the meaning of which the jurors must be deemed to have understood; hence, and especially in the absence of a request therefor, the court was not called upon of its own motion to define them.

A careful examination of the entire transcript convinces us that defendant had a fair and impartial trial, free from any prejudicial error disclosed by the record.

The judgment and order appealed from are affirmed.

Melvin, J., Shaw, J., Sloss, J., Henshaw, J., and Angellotti, C. J., concurred.

Rehearing denied.