[Crim. No. 1962.   Third Dist.   July 15, 1946.]

THE PEOPLE, Respondent, v. JAMES LOUIS WHEELER, Appellant.

Albert M. King for Appellant.

Robert W. Kenny, Attorney General, James O. Reavis, Deputy Attorney General, and Richard H. Fuidge, District Attorney, for Respondent.

ADAMS, P. J.—Defendant was convicted of an assault with a deadly weapon, and has appealed from the judgment and an order denying his motion for a new trial.

The victim of the alleged assault, Duane Poteski, was a soldier 20 years of age, who was stationed at Camp Beale. He testified that he went to Marysville on October 18, 1945, walked around the streets for a while, then went to a place called the Palm Saloon. Just outside this saloon he met a young woman by the name of Mrs. Reese, and together they walked across the street to a rooming house called the St. Elmo, and went upstairs where they stopped in the hallway and talked. While they were so engaged defendant came up to them "in a mean way," whereupon Poteski told defendant that he would not let him hit a woman. Defendant kept on walking toward Mrs. Reese and raised his hand as he did so. Mrs. Reese entered her room and defendant started in after her, whereupon Poteski followed and again told defendant not to hit the woman. Defendant then had his back toward Poteski, but turned around and cut Poteski with a razor, whereupon the latter left and went to the Military Police Station. Poteski testified also that while he had had a few drinks that night he was not drunk; that he had no weapon; that before defendant appeared in the hallway of the St. Elmo Mrs. Reese had told him that defendant had been hitting her and that she was afraid of him; that all he told defendant was that he would not allow him to hit the woman; that he did not touch defendant and that he had no scissors in his hand and did not see any there.

After Poteski sustained his injuries he was taken to Camp Beale. He was attended by Col. Brockhart of the Medical Section. This officer testified that Poteski's injuries consisted of a severe and extensive laceration of the right shoulder, right upper chest and left wrist and forearm; that the lacerations must have been made with a sharp bladed instrument; that it required an hour and forty-five minutes to repair the extensive wounds; that muscles were severed in the right shoulder and down the front side of the body; that the right shoulder joint was laid open, and that the wounds resulted in permanent injury to his right shoulder and upper arm, limiting extension about 25 per cent.

Officer Kibbe, an officer of the Marysville Police Department, testified that on the night of the affray he was passing the St. Elmo in a prowl car when he was accosted by military police who wanted to borrow a flashlight, and stated that there was a man back of the building; that he accompanied them to a roadway upon the levee behind the St. Elmo, and flashing his light down the bank discovered defendant on the ground; that defendant would not get up when called, whereupon Kibbe went after him and brought him to the top of the embankment; that defendant had blood on the front of his shirt and on his sleeve, but a search revealed no weapon; that defendant attempted to break away from him, but the military police held him, and he was taken to the police station by Officers Kibbe and Wemple. Chief of Police Stein testified that on the day after the fracas he talked to defendant who said that he had run at Poteski with a razor, and had afterwards thrown it over the levee; the latter statement he changed and told Chief Stein that he had put the razor up over a door in Mrs. Reese's apartment, at which place it was later found; that he had used the razor because Poteski had come at him with a pair of scissors. Mrs. Reese, called for the defense, testified that she operated the St. Elmo rooming house; that Wheeler lived there and they had been going together for a year, and were engaged to be married; that she and Wheeler had been shopping for Christmas presents the evening of October 18th, but she had left him down town and gone to a cafe for something to eat; that on her return to her apartment she found Poteski at her office door and he asked for a room but was told she had none; that while she was talking with Poteski Wheeler phoned her and said he would be right up; that she told Poteski that her fiance was coming up, and that he should go on; that Poteski started playing with her terrier dog but that nothing was said about Wheeler; that when Wheeler appeared Poteski said, "You are not going to beat this woman up," and started to push Wheeler around; that she told Poteski to leave but he refused and told Wheeler to come downstairs and fight; that he kept crowding Wheeler into the room and the latter backed up against a dresser; that they were "scuffling with their hands" when she saw Wheeler hit Poteski, whereupon the soldier walked out the door; that she then saw blood on the floor where he had been standing, and that a pair of scissors, which had been on the table, were lying on the floor by the blood; that defendant went out the

back door without saying anything, and she did not see him again; that Wheeler had had a razor which was on the dresser in her room. On cross-examination she contradicted her original statement in some details; also previous statements at variance with her testimony were read for impeachment purposes.

Wheeler, testifying on his own behalf, stated that he had been living at the St. Elmo, and keeping company with Mrs. Reese, and that he was going to marry her when her divorce became final; that he took his meals with her and kept some of his clothes in her apartment; that in the late afternoon of October 18, 1945, he and Mrs. Reese went down town together, and had a few drinks at various places; that they became separated about 11:30, and later he telephoned to her and told her he would be right up; that when he arrived at the door of Mrs. Reese's apartment she was standing in the door and Poteski was standing looking in her door and talking to her; that he (Wheeler) started into the apartment when the soldier said, "What is this?," and also said, "You are not going to beat up on this woman"; that Poteski said, "I will break your little neck," and started pushing him around; that defendant went into Mrs. Reese's room and shut the door, and heard Mrs. Reese tell Poteski to go; that he then opened the door and Poteski came in with his fists doubled up and said, "Come out you yellow rat and fight"; that he (defendant) said he did not want to fight, but Poteski came on toward him and, as he reached a table, picked up the scissors and backed defendant up against the dresser; that the witness then picked up the razor and cut Poteski on the hand—that is, he struck at his hand but did not know he cut him; that he tried to grab Poteski's hand and pushed him back, and that Poteski then went out the door without saying a word; that he thought Poteski was going to hit him as he "was awfully mad about something" and "acted like he was drunk or crazy or something"; that after Poteski left, he saw blood on the floor, and ordered Mrs. Reese to wipe it up and then to "call the M.P's"; that he then went out through the kitchen, put the razor where Chief Stein later found it, went down the bank and crawled under and lay down where he was later found; that he could not tell why he ran away.

On this appeal appellant in his opening brief raised three grounds for reversal: First, that the trial court failed to give the statutory admonition to the jury prior to its recesses;

second, that the court erred in instructing the jury; and, third, that the evidence is insufficient to support the verdict. After augmentation of the record the first of these contentions was abandoned. ▮ Regarding the third it is apparent from the foregoing recital of the evidence that it presented a conflict which the jury has resolved against defendant. Its conclusion is binding upon this court. (*People* v. *Alcalde,* 24 Cal. 2d 177, 184 [148 P.2d 627]; *People* v. *Totten,* 63 Cal.App.2d 768, 771 [148 P.2d 97]; *People* v. *Frank,* 60 Cal.App.2d 802, 805 [141 P.2d 780]; *People* v. *Coley,* 61 Cal.App.2d 810, 813 [143 P.2d 755]; *People* v. *Lewis,* 18 Cal.App. 359 [123 P. 232].)

Appellant relies upon *People* v. *Flores,* 58 Cal.App.2d 764 [137 P.2d 767], and *People* v. *Nichols,* 52 Cal.App.2d 31 [125 P.2d 513], as furnishing authority for reversal. We do not agree. In the Flores case the evidence against defendant was circumstantial only, and the court, in reversing the judgment, held that the circumstances particularly relied upon by the prosecution were not inconsistent with a rational conclusion that defendant was not guilty of the theft as charged, and there was, therefore, a failure of proof of guilt. The instant case is not comparable thereto. In the Nichols case the judgment of conviction was reversed because, as the court said, "the prosecution introduced no positive, direct or affirmative evidence on any material issue. The most that can be said of such evidence is that it was highly circumstantial and negative in character, consisting in the main of testimony by witnesses to the effect that they had never seen the allegedly stolen personal property upon the premises of appellant's place of business." A comparison of the evidence in that case with the evidence in the instant case compels the conclusion that it furnishes no precedent for reversal herein.

▮ As for appellant's contentions that the trial court erred in its instructions to the jury, the first appertains to the subject of credibility of witnesses, regarding which the court said:

"The jury are the sole and exclusive judges of the effect and value of evidence addressed to them and of the credibility of the witnesses who have testified in the case, and the character of the witnesses as shown by the evidence, should be taken into consideration, for the purpose of determining their credibility and the facts as to whether they have spoken the truth. And the jury may scrutinize not only the manner of

witnesses while on the stand, their relation to the case, if any, but also their degree of intelligence. A witness is presumed to speak the truth. This presumption, however, may be repelled by the manner in which he testifies; his interest in the case, if any, or his bias or prejudice, if any, against one or any of the parties, by the character of his testimony, his apparent desire to speak the truth, the tenacity, or lack of tenacity of his memory, his opportunity to know the things about which he testifies, and any and all things affecting his credibility, or by evidence affecting his character for truth, honesty or integrity, or by contradictory evidence; and the jury are the exclusive judges of his credibility.

"A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony as to any matter material to the cause on trial.

"A witness false in one part of his or her testimony is to be distrusted in others; that is to say, the jury may reject the whole of a testimony of a witness who has wilfully sworn falsely as to a material point; and the jury, being convinced that a witness has stated what was untrue, not as result of mistake or inadvertence, but wilfully and with the design to deceive, *must* treat all of his or her testimony with distrust and suspicion, and reject all unless they shall be convinced, notwithstanding the base character of the witness, that he or she has in other particulars sworn to the truth." (Italics added.)

Appellant's particular objection to this instruction is the court's use of the italicized word "must," which, he asserts, compelled the jury to reject all of the testimony of a witness whom it suspected of falsity in one portion of his testimony; and that it was clearly prejudicial to the defendant.

Appellant relies upon *People* v. *Hicks*, 53 Cal. 354, where the court instructed the jury that "a witness false in one part of his testimony is to be distrusted in others," and refused to give a requested instruction "that if they believed any witness had, upon the stand, wilfully sworn falsely in respect to any matter material to the issue on trial, that they should disregard his testimony altogether." There the court said, citing *People* v. *Sprague*, 53 Cal. 491, that "the correct interpretation of subd. 3 of sec. 2061 of the Code of Civil Procedure is, that a witness *wilfully* false in one part of his testimony is to be distrusted in others. Assuming this to be the correct construction, the effect of this provision is that if a

witness is wilfully false in one portion of his testimony he 'is to be distrusted in others'; and not that his whole testimony is to be absolutely rejected.''

However, in the instruction given in the case before us, the word must was qualified by the words which follow it. Its language finds approval in *People* v. *Sprague, supra,* where the court said, at page 494:

''The rule is that the jury *may* reject the whole of the testimony of a witness who has willfully sworn falsely as to a material point; that is to say, the jury, being convinced that a witness has stated what was untrue, not as the result of mistake or inadvertence, but willfully and with the design to deceive, must treat all his testimony with distrust and suspicion, and reject all unless they shall be convinced, notwithstanding the base character of the witness, that he has in other particulars sworn to the truth. The third subdivision of sec. 2061 of the Code of Civil Procedure is but declaratory of the rule above considered, and by requiring a jury to distrust, necessarily authorizes them to reject all the testimony of such a witness, in a proper case.'' (Also see *Prickett* v. *Whapples,* 10 Cal.App.2d 701, 704 [52 P.2d 972]; *People* v. *Sloper,* 198 Cal. 238, 251 [244 P. 362].)

Further, it may be well said that the instruction complained of, even if it were erroneous, would not necessarily have been prejudicial to defendant. Its language was applicable, not to the testimony of defendant and Mrs. Reese alone, but to that of Poteski whose testimony appellant contends was ''improbable'' and ''incredible.''

■ Appellant also complains that the trial court failed to instruct the jury sufficiently on the subject of self-defense, and particularly that it failed to give the instruction on this subject proposed by defendant. Instructions given are as follows:

''A person may repel force by force in the defense of person, property, or life, against one who manifestly intends by violence or surprise to commit a known misdemeanor or felony, or either, to do great bodily injury to his person, and the danger which would justify the defendant in the act charged against him may be real or apparent; and the jury is not to consider whether the defendant was in actual peril of his life and property, but only whether the indications were such as to induce a reasonable man to believe that he was in such peril of person or property, and *if he so believed,*

and had sufficient cause so to believe by the conduct of Poteski, and committed the act complained of under such beliefs then you should acquit the defendant.''

"Where one without fault is placed under circumstances sufficient to excite the fears of a reasonable person that another designs to commit a felony or some great bodily injury and there is imminent danger of the accomplishment of this design, he may, acting under these fears alone, stand his ground; and where the attack is sudden and the danger is imminent, he may be justified in slaying his aggressor, even though it may be proved that he might more easily have gained his safety by flight.''

"You are instructed that if you believe from the evidence that at the time of the cutting of Poteski, the defendant Wheeler had ordered Poteski to leave the room and that the said Poteski thereupon refused so to do, then the said defendant Wheeler had a right to exclude Poteski therefrom in defending his habitation and to use all such force as reasonably necessary to eject the said Poteski from the said room.

"You are further instructed that if you should find from the evidence that Poteski was the aggressor and threatened defendant with physical violence at said time, it is the law that a person assailed in his own house is not bound to retreat from the house to avoid violence, even though a retreat may safely be made. If an intruder resists ejection and assaults the lawful occupant, the latter need not retreat, but in protecting his person, he may, if necessary, intentionally take the intruder's life if he has reason to believe that his own life is in danger or that he is in danger of receiving great bodily harm.''

The proposed instruction not given reads:

"You are instructed that the cutting of Poteski by the defendant would be justified if from all circumstances in evidence you find that Poteski manifestly intended and endeavored in a violent riotous and tumultuous manner to enter the habitation where he had no legal right to be and gave evidence that he intended to do great bodily harm to persons therein; and that in the protection of Mrs. Reese and himself the defendant found it necessary to defend himself, then under these circumstances you must acquit the defendant.''

The instructions given were ample to cover the situation. A defendant is not entitled to have his own particular phrasing of the law adopted by the court or given to the jury. It

is sufficient if the substance of the law applicable to the case is set forth by the court correctly in its instructions. (*People v. MacDonald*, 24 Cal.App.2d 702 [76 P.2d 121]; *People v. Parchen*, 37 Cal.App.2d 215, 223 [98 P.2d 1045]; *People v. Vest*, 65 Cal.App.2d 774, 781 [151 P.2d 666].) ▮ Furthermore, the instruction proposed by defendant and refused by the court was defective in that it left it to defendant to determine whether the danger of great bodily injury existed, while the rule as stated in 13 California Jurisprudence, page 638, section 42, is: "It is not enough that there should exist in the mind of the defendant a belief that he is in actual peril. It must appear not only that he believed himself in such peril, but that, *as a reasonable person*, he had sufficient grounds for his belief." (Italics added.) Also there is no evidence that Poteski "intended and endeavored in a violent riotous and tumultuous manner to enter the habitation . . . [or] gave evidence that he intended to do great bodily harm to persons therein. . . ." There was no violence until after Poteski, Mrs. Reese and defendant had entered the room.

Appellant stresses the fact that the testimony of Poteski was uncorroborated, while his own testimony was corroborated by Mrs. Reese. While it is true that Mrs. Reese's testimony did, to considerable extent, parallel that of defendant, nevertheless the jury may well have considered such testimony on her part as unworthy of much weight in view of the intimacy that apparently existed between her and defendant, the fact that her statements at the trial did not conform in several respects to those made by her prior thereto, and her admissions that she had talked the matter over with defendant subsequent to his arrest, that she loved defendant and intended to marry him, and that she "would do anything to avert any harm coming to him."

We find no reversible error in the record, and the judgment and order denying a new trial are affirmed.

Thompson, J., and Peek, J., concurred.