[Crim. No. 3571. First Dist., Div. One. July 23, 1959.]

## THE PEOPLE, Respondent, v. ELMER EDWARD RAMSEY, JR., Appellant.

Paul N. McCloskey, Jr., and Roger L. Mosher for Appellant.

Stanley Mosk, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and John S. McInerny, Deputy Attorney General, for Respondent.

TOBRINER, J.—Appellant contends in chief here that the prosecution engaged in misconduct by improperly trying to implant in the jury's mind the notion that appellant's wife secreted a witness who would testify as to appellant's attempt to concoct a false alibi. Such misconduct, according to appellant, caused a miscarriage of justice under article VI, section 4½, of the California Constitution requiring reversal of a conviction of Penal Code, section 211 (armed robbery). Although we appreciate both the gravity of the offense of the district attorney as well as the close balance of the evi-

dence in this case, we cannot conclude that a verdict more favorable to appellant would have been reached in the absence of the error.

We set forth *infra* in detail our reasoning on this problem, as well as our bases for rejecting appellant's other grounds for reversible error, including his contention that his motion for new trial was improperly denied.

We begin with an analysis of the facts, which fall into the following categories:

*The robbery.* The robbery occurred at 7:20, the night of February 2, 1958, at the U.S. Market in San Jose. When Cicconetti, the head clerk, was in the process of closing the store, he saw a man standing in a darkened aisle. Cicconetti approached him. His face masked, this individual threatened Cicconetti with a gun, marched Cicconetti to the back room, and tied Cicconetti with a rope which he had obtained in the store. Proceeding to the front of the store, the robber returned with the other clerk, Phillips, whom the robber also trussed. Then, to facilitate Cicconetti's getting money from the safe, which was in the front part of the store, the robber untied him. Opening the safe, Cicconetti threw to the robber, hiding behind a partition and therefore invisible from the street, the following denominations: $500 in one-dollar bills, $1,000 in five-dollar bills and seven bags of change. The change bags contained $100 each composed of coins and currency from one cent to ten-dollar bills. Then, returning with Cicconetti to the vicinity of Phillips, the robber retied Cicconetti and looted the cash registers. These contained bills from one dollar to twenty dollars besides the usual coins.

*The earnings, income and abode of appellant.* On February 11, 1958, the police, possessed of a search warrant, checked appellant's living quarters. His abode turned out to be the home of Mrs. Childress, appellant's wife's sister, and her three children. Appellant had moved in either in October or November, 1957. Since that time until the robbery of February 2, 1958, appellant had worked three or four days. During that whole period the Ramseys and Mrs. Ramsey's three children by a former marriage had lived on Mrs. Ramsey's gross earnings as a waitress at a drive-in restaurant of $80 per week.

*The findings of the police officers.* The officers discovered in appellant's bedroom a metal box and in his wallet a key to the box. Within the box there were $785 in five-dollar bills, $465 in one-dollar bills, and a loaded .32 caliber re-

volver. The officers also found, next to this metal box, a cigar box which contained $215 in dimes, quarters and half dollars. The officers seized these articles but upon Mrs. Childress' insistence that it belonged to her children left a small cardboard box containing approximately 200 pennies and a few nickels. Appellant's wallet contained $126, plus receipts which indicated he had spent approximately $350 in the period between the robbery and this search a week later. Appellant stated that this money was his; that he need not account for it, and then called an attorney. Later appellant claimed he had won the money gambling in Reno.

*The identification of appellant.* At the trial Cicconetti stated that he could make no positive identification of appellant, but that his build, age and voice were similar to the robber's; that the gun found at appellant's home "looked like" that of the robber. On cross-examination Cicconetti admitted he had been unable to identify appellant's voice at police headquarters while listening to appellant from a concealed position, but that between the first trial and the instant one he had listened to appellant's voice on a tape recording and that it sounded the same as the robber's.

*The identification of the gun.* The gun, People's Exhibit No. 1, was identified by its owner, Mr. Caldeira, who discovered it missing January 31, 1958. Mrs. Caldeira testified she lent it to Mrs. Ramsey on January 31, 1958. Cicconetti testified that the gun found at appellant's home "looked like" that of the robber.

*Appellant's alibi.* Appellant's main alibi witness was Mrs. Childress, who testified she saw appellant at 7:15 the evening of February 2, 1958, at a motor movie 9 miles from the U.S. Market. She also stated that she saw appellant win $500 in Reno the weekend of the 7th of February, 1958. The prosecution admits appellant was in Reno the weekend of the 7th since one of the receipts found in his wallet bears a Reno address and such a date.

As we have initially indicated, appellant's main contention is that the district attorney committed a series of acts of misconduct aimed to induce an improper misconception of the jury in the following manner: first, in her opening statement she asserted that she would "show . . . the day after the robbery . . . [Mr. Childress] was approached by Mr. Ramsey and Mr. Ramsey asked him, 'If anybody questions you about what I was doing Sunday evening, will you say that I was at the show with you and your family' " but

she had not produced Childress as a witness; second, she persisted in asking a police officer who was a witness if he had attempted to serve a subpoena on Mr. Childress; third, she asked Mrs. Childress if she were in contact with him, following this question with an attempted impeachment of the witness; fourth and finally, she confronted appellant's wife with the improper question, "Where are you hiding your brother-in-law?" We consider the alleged misconduct and its effect separately and cumulatively.

First, we examine the opening statement. In such a statement "it is the duty of counsel to refrain from referring to facts which he cannot or will not be permitted to prove." (*People* v. *Chester* (1956), 142 Cal.App.2d 567, 574 [298 P.2d 695].) But the failure to produce proffered proof, "either on account of the rules of evidence or for any other reason, does not necessarily indicate prejudice." (*People* v. *Planagan* (1944), 65 Cal.App.2d 371, 407 [150 P.2d 927].) The statement, of course, does not constitute and cannot "be considered as evidence" and "binds no one by its recitals." (*People* v. *Stoll* (1904), 143 Cal. 689, 693, 694 [77 P. 818].) Because of the limitations upon the effect of the opening statement, one who asserts it as misconduct must prove more than the mere failure to adduce the testimony described in it. In *People* v. *Wong Hing* (1917), 176 Cal. 699 [169 P. 357], defendant assigned misconduct on the part of the district attorney in a prosecution for murder because in his opening statement he said, " 'We expect to show that on . . . [March 5, 1917] . . . a Chinese tong was begun in this city,' " and "no evidence was offered in support of the statement . . . to the jury. . . ." The court held, "there is nothing in the record tending to show that it [the statement] was made in bad faith or without intention of trying to support it by evidence. In the absence of such showing it cannot be said the district attorney was guilty of misconduct because he failed to produce such evidence." (P. 703.) To the same effect, *People* v. *Berryman* (1936), 6 Cal.2d 331 [57 P.2d 136].

In the instant case, we lack a showing of deliberative intent of the prosecutor not to produce and examine Childress. Admittedly the task of finding and subpenaing Childress might have been difficult; it had actually failed in the first trial. But the possibility of failure to produce a wanted witness and its later culmination into fact does not turn the prosecutor's stated purpose into a strategy of bad faith.

The opening statement of the expected proof and its subsequent collapse cannot *per se* show an unfair intent; if it did, any bare failure of proof promised in an opening statement could be converted into grounds for reversal.

■ A secondary reason for the failure of this assignment of error lies in the fact that appellant offered no objection to the statement. *People* v. *Chester* (1956), *supra*, 142 Cal. App.2d 567, indicates that if appellant knew the prosecutrix could not prove the assertion as to Childress' testimony, appellant should have objected at the time instead of relying upon the possibility of a later reversal. On appeal the rule applicable to objections as to the form of a question is equally applicable to the composition of the opening statement. To the same effect, *People* v. *Granados* (1957), 49 Cal.2d 490 [319 P.2d 346].

For the above reasons the opening statement *per se* does not constitute prejudicial error.

■ Second, the district attorney's questioning of Officer Petersen does not in itself constitute prejudicial error. The prosecution asked the officer if he had made any attempt to serve the subpena on Mr. Childress; the court immediately sustained appellant's objection. Reversible error does not flow from an irrelevant question nipped in the bud by a sustained objection.

■ Third, the prosecution's questioning of Mrs. Childress as to the location of her husband and the following attempt at impeachment, again, does not in itself constitute prejudicial error. If the attempt of the prosecution to explore the location of the missing witness may have been irrelevant, it surely was not prejudicial. *People* v. *Kristy* (1952), 111 Cal.App.2d 695 [245 P.2d 547], holds that prejudicial misconduct does not result from an irrelevant question, to which objection is made, in the absence of a request to the court to admonish the jury to disregard the question "when such an admonition would doubtless have been sufficient to cure any effect the questions might have produced. . . ." (P. 713.) While the court allowed the first question as to where her husband was, the court blocked further exploration of this subject.

■ As to the district attorney's attempt to impeach Mrs. Childress by questions as to her conversation with her husband in which he reputedly said he did not see appellant at the movie, the court refused to allow the question and it was withdrawn. The prejudice, if any, was cured. (*People* v. *Alcalde* (1944), 24 Cal.2d 177 [148 P.2d 627].)

■ Fourth, the prosecution's accusation that appellant's wife was hiding her brother-in-law constituted grave misconduct. Again the question in itself, considered in the light of the Kristy case, is not sufficient to constitute prejudicial error. However, as a culminating tactic of the district attorney, it leads us to the final and crucial question.

■ Although the four instances of misconduct separately do not afford sufficient basis for reversal, their cumulative impact may compel a different conclusion. The misconduct may have implanted in the jury's mind the notion that defendant's wife concealed a witness who would testify that defendant had attempted to establish a false alibi. But even if we make this assumption we must still weigh the effect of the prosecution's conduct in the scale described in *People* v. *Watson* (1956), 46 Cal.2d 818 [299 P.2d 243], "That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (P. 836.)

The application of this test is admittedly delicate. The consequences of breaches of behavior of counsel are not susceptible to examination under a legal microscope; it is impossible accurately to measure the shifting impact of misconduct in the swift ebb and flow of a trial. But our task must be to examine the entire record with care to determine if in our opinion "it is reasonably probable" that the omission of these misdirected questions of the district attorney would have resulted in a more favorable decision for the appealing party. We cannot reach such a conclusion.

■ The jury was confronted with such evidence as this: (1) the conformity of the denominations of money stolen and money found in appellant's possession; (2) the failure satisfactorily to account for its presence, appellant's expenditure of some $300 prior to the Reno trip, the disparate testimony of "winnings" at Reno but no showing that there were no losses, the strange explanation that the winnings were cashed into these denominations "to surprise Betty"; (3) the description of the robber's gun as a "short" or "snubnosed" gun of "steel grey" color without a hammer and the testimony at the trial that appellant's gun was the "same kind of gun," hammerless and found loaded in the same box as the money; (4) the testimony by Mrs. Caldeira of lending the gun

to Mrs. Ramsey on January 31 and Mrs. Ramsey's apparent hurried attempt, on February 11, the date of appellant's arrest, to establish the date as February 7 (no such difficulty as to the date of the loan should have arisen had it been four days previous) ; (5) the fact that appellant fitted the general description of the size and build of the robber and the testimony of both clerks that appellant's voice sounded similar to that of the robber; (6) the difficulties in the alibi account of Mrs. Childress in her exactitude in identifying appellant and her coincident looking at her watch at 7 :15 p.m. at the movie although she had previously told the police officer she did not see his face but only "thought it might have been" appellant.

The weight of such evidence as this is heavy as contrasted to the erroneous intimation of a possible concealment of a witness who would testify as to an attempted false alibi. While we deprecate the misconduct of the district attorney, there is too much else in the record upon which conviction could properly rest to rule that the exculpation of the offending questions could *per se* have led to a different result. It is simply not reasonably probable that the presence or absence of unanswered questions as to the absent witness could have made the difference between a verdict of guilt and innocence.

Finally, the court instructed the jury to disregard intimations raised by questions of any attorney "which the Court has not permitted to be answered that certain things are or are not true." The instruction sought to remove, and undoubtedly reduced, any adverse effect of the misconduct.

Appellant's citation of *People* v. *Teixeira* (1955), 136 Cal. App.2d 136 [288 P.2d 535], does not change our conclusion because the misconduct there as contrasted with that here was so much more flagrant, and the allusion to the missing witness so much more related to the whole import of the case, even to the extent of inclusion in the closing argument of the prosecution.

We therefore turn to a consideration of the remaining contentions of appellant.

Appellant's claim of prejudicial error in the district attorney's intimation that prior to the crime appellant possessed certain "incriminating items" collapses in the face of the subsequent proof adduced by appellant himself of the identity of such items.

The prosecution introduced the testimony of a police officer to show that on an occasion three months prior to the

robbery he found in appellant's car a rope knotted in the same fashion as used in trussing the robbed clerks. After the court confined the officer's answers to the discovery of the rope, the prosecutrix intimated that appellant's attorney did not want the witness to tell "what else Ramsey had in his possession at that time." However, on cross-examination of the police officer, appellant's attorney adduced that appellant was "waiting for his wife . . . somebody in the drive-in [had been] bothering her . . . and that is the reason he had a weapon in the car. . . ." The controverted "else" crystallized into the gun. The error, if any, flowing from the perhaps improper intimation of the prosecution was cured by the cross-examination. (*People* v. *Dye* (1947), 81 Cal.App. 2d 952 [185 P.2d 624].)

Nor does it avail appellant to contend that the entire testimony of Officer Edwards should have been excluded as testimony relating to an irrelevant prior circumstance. Since the matter of the knotting of the rope bore upon the vital and disputed question of the identity of the robber, it did " ' . . . tend logically, naturally and by reasonable inference to establish . . . [a] fact material for the people. . . .' " (*People* v. *Sykes* (1955), 44 Cal.2d 166 [280 P.2d 769].)

Appellant's argument that the introduction of evidence of identification of appellant's voice through the use of a tape recorder constituted a violation of the principles of fair play involves, in final analysis, a matter for the jury's determination. Witness Cicconetti testified at the first trial he could not identify the voice; however, at the second trial he stated that the police officers had played a tape recording to him which "sounded the same" as the robber's voice. Appellant had the opportunity, which he utilized, to expose to the jury the inconsistency of the testimony. Hence as *People* v. *Sica* (1952), 112 Cal.App.2d 574 [247 P.2d 72], states, "The correctness of the identification of his [appellant's] voice . . . was a question of fact primarily for the jury's determination. . . ." (P. 583.) The facts of *People* v. *Evans* (1952), 39 Cal.2d 242 [246 P.2d 363], in which a witness "had been suggestively questioned and re-questioned as to the crime by the police" (p. 252) and the "exactitude" of the identification by a 10-year-old child of the defendant in that case, which raised "a doubt as to whether or not she had been coached in her lines" (p. 250), find no counterpart here.

We cannot sustain appellant's objection to the impropriety of the prosecution's closing argument that the police

and the prosecution believed the appellant guilty. The jury must necessarily know that the police would not arrest in the absence of belief of guilt; appellant's failure to object is fatal in so tenuous a circumstance (*People* v. *Adamson* (1946), 27 Cal.2d 478, 494 [165 P.2d 3]); the cited case of *People* v. *Edgar* (1917), 34 Cal.App. 459 [167 P. 891], does not rest upon the lonely argument of the district attorney that he was convinced of defendant's guilt but upon an abundance of collateral error.

▆ Finally, we do not find that appellant's motion for a new trial on the basis of newly discovered evidence was improperly denied. Appellant relies on affidavits of three persons in Reno who would presumably have testified that appellant had won at the gambling tables. Applying the test of *People* v. *Brown* (1958), 164 Cal.App.2d 790 [328 P.2d 775], that "defendant must show that the evidence . . . is newly discovered . . ." and "could not with reasonable diligence . . . have [been] discovered and produced . . . at the trial," appellant fails adequately to explain why such potential witnesses were not earlier produced. The same authority imposes upon defendant the further obligation of showing that "the evidence is not merely cumulative. . . ." (P. 792.) Yet here Mrs. Childress testified that she saw appellant win $500 in gambling; the allegedly "new evidence" is indeed cumulative. *People* v. *Goodwin* (1927), 202 Cal. 527 [261 P. 1009], cited by appellant, is not pertinent because there the defense had sought to obtain the witness at least prior to the termination of the trial; the effort here was belated.

We affirm the judgment and the denial of the motion for a new trial.

Bray, P. J., and Wood (Fred B.), J., concurred.