[Crim. No. 3689. First Dist., Div. One. Nov. 3, 1960.]

THE PEOPLE, Respondent, v. SEYMOUR A. WIRTH, Appellant.

Rolf M. Bondelie for Appellant.

Stanley Mosk, Attorney General, Arlo E. Smith and Daniel A. Sharp, Deputy Attorneys General, for Respondent.

DUNIWAY, J.—Appeal from a judgment of conviction (order granting probation) of two counts of violation of Insurance Code, section 556, subdivision (b), making and subscribing a writing with the intent to use it in support of a false claim of loss under a contract of insurance, and one count of violation of Insurance Code, section 556, subdivision (a), presenting a false claim under a contract of insurance. Defendant claims that the evidence was insufficient to sustain the conviction, that he was unlawfully entrapped, and that the district attorney was guilty of misconduct requiring a reversal. We conclude that the judgment must be affirmed.

1. *The evidence was sufficient.*

The evidence of guilt was more than sufficient; it was almost overwhelming. It shows that on two occasions, July 29, 1958 (count one), and August 15, 1958 (count two), defendant signed written statements which he gave to the insurance company's adjuster in support of a claim of loss under a policy insuring his car against theft. The first statement says: ''The car was equipped with radio, heater, Fordomatic, clock, seat covers when it was stolen. All of the window glass in the car was in good condition at the time of the theft, except that the left door glass was broken. There was no damage to the body at the time of the theft and the car was in good operating condition.'' The second statement was in substance and almost word for word the same. The first was taken down by the adjuster on the basis of questions he asked defendant. The second was handwritten on a proof of loss by defendant himself. He also presented through the adjuster a claim of loss in which no damage to the car was disclosed.

A police officer testified that on more than one occasion, shortly before the claimed theft of defendant's car, he saw it in front of defendant's house. '' [I]t was completely stripped; didn't have any bumpers, the chrome around the headlights was missing, the chrome around the taillights were missing, there was no radio, there was a very bad dent in the right panel . . . behind the front door. . . . The glass was smashed in all of the windows except the driver's side [and possibly the rear window]. There was quite a big piece missing. . . . The

front door was held together with a piece of wire, with a big dent on the right side.'' ''The hub caps were gone.'' ''The radio was gone.''

The car was found on a hillside where it had either been pushed or had run down into the brush. After it was recovered, it showed the same damage as was seen by the officer, plus additional damage.

The car had been in an accident on the previous December 31. At that time the right rear panel was damaged and the left front window was broken. The damage was never repaired, although defendant, who operated an auto body repair shop, collected $499.89 for the damage from the other party's insurance carrier on March 11. On March 26 he took out theft and comprehensive coverage on the car with a company with which he had never previously carried insurance.

Defendant himself testified that when he signed the statements, he knew that the right rear quarter panel was damaged, and his own witnesses corroborate this. Moreover, he was evasive about several of the missing parts and accessories when questioned by the police. A police officer testified that he said, '' 'Everybody fudges on a claim to an insurance company. They do it every day,' '' that in regard to the written statements, he said '' 'it wasn't the whole truth, and it wasn't untrue,' '' and that he refused to be more specific on the ground: '' 'If I answer this, I may or may not be putting my foot in it.' ''

Defendant and his witnesses testified that the car had indeed been stripped, but that the parts and accessories removed were in the trunk, to be sure that they were not lost. The purpose was said to be to prepare the car for being remolded and painted, using a new type of plastic. Defendant's two principal witnesses were his partner and a representative of the manufacturer of the plastic. Both were ex-felons.

Bearing in mind the rule that the evidence must be viewed in the light most favorable to the verdict, the resolution of conflicts being for the jury (*People* v. *Ashley,* 42 Cal.2d 246, 266 [267 P.2d 271]), we conclude that the evidence was more than sufficient. *People* v. *Nichols,* 52 Cal.App.2d 31 [125 P.2d 513], on which defendant relies, rests upon facts quite different. It has never been cited except to be distinguished (*People* v. *Wheeler,* 75 Cal.App.2d 360, 364 [171 P.2d 62]; *People* v. *Alexander,* 78 Cal.App.2d 954, 957 [178 P.2d 813]; *People* v. *Massey,* 151 Cal.App.2d 623, 650 [312 P.2d 365]).

### 2. *Defendant was not unlawfully entrapped.*

 The claim of entrapment is based on the fact that the two statements were given to the adjuster at the adjuster's request. Defendant testified that he told the adjuster that the car was damaged in the right rear quarter and the left front door, and that the adjuster told him he need not put that down. Defendant also testified that he told the adjuster that the car had been stripped, but not that the items removed were in the trunk. The adjuster's testimony is to the contrary and the jury believed him. He obtained the statements because he had learned from the police that the car was severely damaged before the alleged theft.

 It is not the entrapment of a criminal upon which the law frowns, but the seduction of innocent people into criminality by officers of the law, the rationale being that it is less evil that some criminals should escape than that the government should play an ignoble part. (*People* v. *Benford,* 53 Cal.2d 1, 9 [345 P.2d 928].) In 73 Harvard Law Review 1333, at page 1340, the writer announces his inability to find any case in the United States which holds purely private action sufficient to sustain a defense of entrapment. As the Benford case states, the intent to commit the crime must originate in the mind of the entrapping officer, rather than in the mind of the defendant. Even assuming that an "entrapping officer" may be discovered lurking in the record, it is clear that the idea for the claim originated with defendant. The adjuster was simply protecting his company and himself by seeking adequate evidence of the falsity of defendant's claim.

Below, the burden was on defendant to prove entrapment. In this court, he must demonstrate the existence of this defense as a matter of law. (*People* v. *Terry,* 44 Cal.2d 371, 372 [282 P.2d 19].) Defendant has failed to meet these exactions. There is no evidence at all that any policeman or other government officer cooperated with the adjuster in establishing defendant's guilt. Moreover, there is ample and sufficient evidence from which it may be inferred that the intent to file a false claim originated in the mind of defendant. (*People* v. *Terry, supra,* 44 Cal.2d 371, 372-373 [282 P.2d 19].) Defendant misrepresented and suppressed the facts as to the Ford's true preexisting condition throughout his interviews with the adjuster.

*3. The district attorney was guilty of inexcusable misconduct.*

 Certain of defendant's claims of misconduct relate to matters of a minor character, as to which there was no objection. They were of a sort readily curable by an admonition, had defendant objected. (*People* v. *Chavez,* 50 Cal.2d 778, 793 [329 P.2d 907].) Others involve what appears to us to be proper probing on cross-examination to determine the relationship, if any, between defendant's witnesses and himself. In still another instance, there was a suggestion in the district attorney's opening argument that the theft of defendant's car may have been spurious. The matter was again referred to in his closing, with the statement that such a spurious theft was not proved. There was much in the evidence to suggest that the theft was faked, and the argument was legitimate. If the foregoing were all, there would be no problem, but there was much more.

Defendant's counsel in his opening statement had referred to defendant's consultations with him concerning the company's failure to pay the claim, and a subsequent demand made by them on the company in which they threatened to complain to the Insurance Commissioner. He stated in his argument that the whole controversy should have been settled by a civil suit between defendant and the insurance company rather than by a criminal action. A question as to whether an insured is entitled to anything from his insurer, he said, should be determined by a suit in court, and he assured the jury that "we intend to do so when this case is over."

The district attorney returned to the fray by announcing: "Counsel started out by telling you that this is really a civil matter and should be handled in a civil court. The evidence is certainly clear that he and the defendant are planning a lawsuit, and I think you can remember the statement he made to you in his opening statement, that the insurance company had him arrested, and there is going to be a lawsuit for fifteen or twenty thousand dollars, and he will get his share, no question about it." Upon hearing the above remarks, counsel for defendant attempted to object, and the following transpired: "Mr. Ageson [defense counsel]: I never implied —— Mr. Hoffman [deputy district attorney]: I think the record speaks for itself. He said the insurance company had him arrested. I am counting on it. The Court: The jury heard it. Whatever you said, the jury heard what you said. Mr. Ageson: All right. The Court: Proceed. Mr. Hoffman: I don't

think there is a bit of question about it. When we get through here, if they can hoodwink you or any one of you, they will move on to bigger things. . . . [D]on't think the two of them —he told you in the closing argument—don't think the two of them won't move on to an attempt to really shake down the insurance company if they beat this one. MR. AGESON: I must ask that that be —— MR. HOFFMAN: It is comment on the closing argument. THE COURT: Well, he has a right to comment on what you said also. MR. AGESON: Yes, but I said nothing like that. MR. HOFFMAN: It is for the jury to decide, Your Honor. They heard it. THE COURT: If Mr. Hoffman is misquoting you to the jury —— MR. AGESON: He is misquoting me and I assign it as prejudicial conduct. THE COURT: If the jury finds that Mr. Hoffman has misquoted you, they can disregard what Mr. Hoffman is saying. Proceed. MR. HOFFMAN: Thank you, Your Honor. He told you there was going to be a lawsuit, and you can rest assured it will be a good one, and that is why it is here in this court, because he has got to beat this one before he can go on to that one. If he can't beat this one, he might as well forget it.''

The district attorney had the right to comment on counsel's argument, but the remarks quoted had no place in the case. Not only did they tend to inflame the jury, but they were subject to the interpretation that a verdict of acquittal would lead to defendant's recovering—on what grounds the jurors were free to speculate; possibly in their minds the mere failure of the state to convict—damages from the insurance company for subjecting defendant to a criminal action. The effect of the court's intercession can hardly be termed corrective. It legitimated the substance of the district attorney's remarks by placing its ruling on the question of misquotation, and it aided the suggestive effect of the offensive remarks.

The district attorney likewise had the right to attack the credibility of the defendant's witnesses, and for that purpose to show that they had been convicted of felonies. This he did, the convictions being at least eight years old. Again, however, he went beyond the bounds of propriety. In his references to defendant's partner Babb and to Raime, the plastic manufacturer, the district attorney persisted in characterizing them as if they were presently engaged in the activities for which they had been convicted years before. He was heavy in his insinuations or flat assertions that defendant, his witnesses, and his attorney, Mr. Ageson, were actively colluding to hoodwink the jury. He also had the right to attack

defendant's story that the missing articles were in the trunk of the car, but in doing so he went outside the record to assert that defendant, up through two preliminary hearings, had still not told the story.

The following are examples: In cross-examining Babb, the district attorney asked: ''Q. Now, you have another occupation, haven't you, Mr. Babb? You were convicted of burglary in Los Angeles, weren't you? A. Yes, I was. I don't have another occupation, though. That is when I was a kid, a long time ago. . . . Q. And that was 1950. . . . A. It was long before that, three or four years before that. . . . Q. When was it? A. I can't recall.'' In the district attorney's opening argument he said: ''I am not going to belabor the man because he is a burglar, the other man because he happens to be a counterfeiter, but those are the kind of people they brought in here, and they didn't tell you about it. . . . You didn't hear a word from him [Raime], he didn't tell you that he is a counterfeiter. . . . They didn't tell you the other man was a burglar, either. They didn't tell you anything about that. . . . As it happened I didn't have a shred of proof in my file or anything about it. They didn't look right to me and I asked them and it turned out we hit it. You have to consider those things. . . . [W]hen we have a man who is a convicted felon, and these are both felonies, burglary and counterfeiting, it is permissible for us to mention it, . . . and that helps you to determine whether or not he is likely to be the kind of man that will tell the truth. I think it is something more in the case, the fact that all of that was concealed from you by the defense, and if I hadn't caught it, it would have gone right on through. . . . [A]nd again I will mention it, because it is pertinent, one turned out to be a burglar and that they didn't tell you about, and the other was a counterfeiter, and then we had two young men, and both of them had their cars worked on in the place. I mean, they are nice enough appearing young men. One had a little bit of a goatee and suede shoes and that kind of thing. Don't hold that against him. A man can dress any way he pleases. You know they are with a group that have been hanging around the shop. You know a normal garage doesn't spend a lot of time modifying cars. . . . That is his business to do any kind of work he does, but it is important when you consider the witnesses. . . .

''Now, he wants to tell you, and he had the opportunity at both preliminary hearings and didn't do it, . . . and wants to tell you now for the first time at this late date that all of

that stuff was in the trunk all the time. . . . [T]wo preliminary hearings and he didn't tell anything about it, and he wants you to believe that is where it was.''

And in his closing argument, following his expatiation on the suit proposed by defendant and his counsel, the district attorney continued as follows: ''. . . here is a man that slips you a burglar and a counterfeiter and nobody knows about it. You saw the way the fellow [Raime] talked. Everything is just as proper almost as Mr. Ageson, very convincing, . . . and it turns out he is a counterfeiter. Keep it in mind, because you have to decide who you are going to believe. If you want to believe the counterfeiter and the burglar, that is your privilege. . . . He [defendant] told him [Mr. Ageson] the radio and all of the other things were in the car. Sure, they were in the trunk of the car, and he comes up with that story for the first time now. There was an opportunity to tell it to the police, three times. . . . Three times, two preliminary hearings, with his attorney, and he never told him [whom?] about it. . . . MR. AGESON: I assign that as misconduct. There is no reason to argue about the preliminary hearing. MR. HOFFMAN: I have no intention of mentioning it again. THE COURT: I think these are all comments on the evidence. MR. AGESON: The preliminary hearings are not in evidence. The man did not testify. THE COURT: All right, proceed with the argument. MR. HOFFMAN: Thank you, Your Honor. And then he did say that he went in and told the police at first, that all of that stuff was in the trunk. Well, it is the first time we have heard the story. I started to scramble and I brought in the Chief and I brought in the other officer . . . and I brought the lady that took it down, and they all say the same thing: No. . . . [C]ounsel apologized considerably to you in argument about Mr. Babb and Mr. Raime. He told you that he didn't know about one of them being a burglar and one of them a counterfeiter. Maybe he did and maybe he didn't, I can't prove that he did. . . . You know what happened, they didn't know we would catch them. . . .''

The attorney general raises again the lack of an objection as to most of the above, and also argues that the district attorney was properly arguing matters of credibility and could not have been understood as accusing defense counsel of wilfully attempting to mislead the jury or of other misconduct. (See *People* v. *Morrison,* 168 Cal.App.2d 235, 254-255 [335 P.2d 1022] ; *People* v. *Sanchez,* 148 Cal.App.2d 593, 596 [307 P.2d 79].) Concerning the references to the preliminary

hearings, the attorney general points out that objection was made, and urges: "The Court found no harm was done. Apparently the Court felt that the jury could safely consider that there may have been two preliminary hearings. There is no basis in reason to the contrary."

Following sufficient repetition of error, it would seem that a point must be reached after which defendant can no longer be precluded from being heard on his claim of error because of failure to object. The district attorney's excesses cannot have been committed in good faith, and, at least after defendant's counsel had unsuccessfully called upon the court to curb the remarks concerning future litigation, harm rather than help was to be feared from appeals to the bench, as was later demonstrated. (*Cf. People* v. *Simms,* 144 Cal.App.2d 189, 196 [300 P.2d 898].)

The district attorney's excursions beyond the record were inexcusable. The references to the preliminary hearings might have been considered by the jury to be the final strain on its collective credulity. Whether they heard, believed, or understood the assertion by defense counsel that defendant did not testify at the hearings cannot be known. Certainly the jury cannot be expected to have known that it would have done defendant no good merely to raise conflicts in the evidence at those hearings. No objection was raised to the first two references to the preliminary hearings, but the damage was done, and it is probable that defense counsel was unwilling to risk drawing attention to what had been said. An objection to the third reference was rejected by the court, and the district attorney then departed once more from the evidence to confide that he and others had never before heard of defendant's purported disclosure to the police. (See *People* v. *Kirkes,* 39 Cal.2d 719 [249 P.2d 1]; *People* v. *Beal,* 116 Cal.App.2d 475 [254 P.2d 100]; *People* v. *Simms, supra,* 144 Cal.App.2d 189 [300 P.2d 898]; *People* v. *Ford,* 89 Cal.App.2d 467 [200 P.2d 867]; *People* v. *Edgar,* 34 Cal.App. 459 [167 P. 891]; *People* v. *Lynch,* 60 Cal.App.2d 133 [140 P.2d 418].)

One can hardly hold it against defense counsel that he did not object, in view of what happened to him when he did. It is the district attorney's duty to refrain from excesses of this kind. Likewise it is the duty of the court to protect the defendant from such excesses when they occur, rather than to encourage them as it did here. The court did not attempt to cure the effects of the misconduct in its instructions. This court commented at length on improper conduct by a dis-

trict attorney in *People* v. *Talle*, 111 Cal.App.2d 650, 677-679 [245 P.2d 633], and again in *People* v. *Ramsay*, 172 Cal.App. 2d 266, 274-275 [342 P.2d 287]. This case is more flagrant than Ramsay, less so than Talle. If our function on appeal were to discipline the district attorney we would not hesitate to do so. But our function is different. We are directed by the Constitution not to reverse "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Const., art. VI, § 4½.) ▮ The Supreme Court has interpreted this to mean that, if we reverse, we must be "of the opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached, in the absence of the error. (*People* v. *Watson*, 46 Cal.2d 818, 835 [299 P.2d 243] ; *People* v. *Bevins*, 54 Cal.2d 71, 78 [4 Cal.Rptr. 504, 351 P.2d 776].) ▮ The evidence against defendant in this case, including his own testimony, is so strong that we cannot reach such an opinion. We hope, however, that our refusal to reverse will not be taken by the district attorney as a license to repeat such excesses. He, like us, and like the court below, has a duty to perform, and it is his responsibility to perform it fairly, and that of the trial court to see that he does so.

Affirmed.

Bray, P. J., and Tobriner, J., concurred.