[Crim. No. 9871. Second Dist., Div. Two. Mar. 25, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. CARLOS MARTINEZ, Defendant and Appellant.

Louis R. Hersh, under appointment by the District Court of Appeal, and Robert W. Schafer for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and William L. Zessar, Deputy Attorney General, for Plaintiff and Respondent.

FLEMING, J.—Defendant was charged with murder, and in a nonjury trial convicted of involuntary manslaughter. The sole issue before us arises out of the admission in evidence of defendant's statements given to the police without constitutional warning. (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].)

About 4 p.m. on the day of the killing, William Tabor saw the deceased, age 40, seated in a chair in the defendant's room. Defendant, age 79, was sitting on the bed about 3 feet from deceased. Defendant and deceased were arguing and cursing, and defendant was waving a knife. Deceased "was just daring him, and all of that. That has been going on for years." Deceased and defendant lived in the same apartment house and had known one another well for several years. Tabor left the scene and returned later when he heard a racket. On entering the room he saw blood on the floor, and the deceased on top of defendant on the bed. "They were wrestling at the time, and I could see [the deceased] getting white and he couldn't do much. . . . One hand was holding [defendant's] arm with the knife and the other one had hold of the other hand. He [deceased] wasn't very hard to pull loose." After pulling the deceased off the defendant, Tabor called an ambulance and the police.

 About 5 p.m. the police arrived and arrested the defendant. Officer Sparkenbach testified the defendant made the following oral statements in the patrol car on the way to the police station: "He stated that he and the victim had been drinking . . . and . . . got in an argument and the victim wanted some money for some more wine . . . plus the victim was sitting in the favorite chair . . . as the argument got heated, the victim stated he could overcome the . . . defendant. The defendant said that he was a Marine and no one could overcome him. And he picked up this knife, put it in his hand . . . He said that he had stabbed the victim with this knife and that he hoped that he died, went to hell. And he made the statement over and over that he was a Marine, no one was going to overcome him."

 About 6 p.m. at the police station defendant signed a statement which had been written and prepared by the police. The statement included the following: "For some time now Leon [deceased] has been trying to pick a fight with me because he thought he could take me for my money. But tonight I showed him, when he tried to overpower me, he grabbed my arm and twisted it behind me and I told him to turn me loose when he didn't I took care of him. I grabbed my knife off the table and hit in four or five in the stomach until Lloyd [Tabor] stopped me. I was so crazy mad I wouldn't have stopped till I killed him . . . As far as I know he didn't have a knife or anything like that in his hands. He is only forty years old and I'm 79, that's why I used the knife."

At his trial defendant testified the incident happened in the following manner: deceased entered his room without permission, refused to leave although asked to do so, said he would leave after he obtained defendant's money, and would break defendant's neck if he didn't give him money. Defendant said he didn't have any money. Deceased said that defendant had money in the bank and should go to the landlord for money. Defendant said he had no money, and then deceased hit him on the collar bone and twisted his arm behind his back. After defendant got away, the deceased grabbed him again and said for the second time he would kill him and would stomp him through the floor. Defendant then took a knife from a table near the foot of the bed and stabbed deceased once in the stomach. Defendant testified that at the time of the incident he was weak and often used crutches, because he had broken his leg several months before and had been in the hospital in traction for three months. On cross-

examination he stated that deceased had a tool of some kind and had hit him on the leg with it.

The autopsy revealed that deceased was intoxicated at the time of the killing. It showed two stab wounds in the stomach, a cut in the throat, and a cut over the left eye.

1) *Right to Counsel and Right to Remain Silent*

*People* v. *Dorado* held that ". . . when the investigatory stage has become an accusatory one, that is, when it has begun to focus on a particular suspect, the suspect has been taken into police custody, and the police have carried out a process of interrogations that lends itself to eliciting incriminating statements" then the suspect must be advised of his right to counsel and of his right to remain silent. (62 Cal.2d 338, 354 [42 Cal.Rptr. 169, 398 P.2d 361].) In this case the defendant made statements to the police on two separate occasions: initially in the patrol car, and later at the police station.

The statements of defendant in the patrol car do not appear to fall within the *Dorado* rule. There is no evidence that at that time the police were carrying out a process of interrogations in an accusatorial manner designed to elicit a confession or incriminating admissions. Moreover, some of defendant's statements were not even prompted by any questioning. For example, defendant kept repeating over and over that he was a marine and no one was going to overcome him. *Dorado* makes clear that spontaneous declarations of this sort need not be excluded. (See fn. 8, 62 Cal.2d at 354.)

The signed statement at the police station comes within a different category. The statement was written by the police, read back to the defendant,[1] and then signed by him while in custody approximately one hour after his arrest. We have no doubt that at that point suspicion had focused on the defendant, that questioning had reached the accusatory stage, that the police had determined to charge defendant with a crime, and that he should have been warned of his rights. While there was no showing of prolonged or coercive interrogation, it is apparent that the statement secured by the police was deliberately elicited with accusation as its purpose. (*Escobedo* v. *Illinois,* 378 U.S. 478, 492 [84 S.Ct. 1758, 12 L.Ed.2d 977].) Since it does not appear that defendant was advised of his right to remain silent and to have counsel, as set forth in *Dorado,* we conclude that the signed statement should not have been admitted in evidence. (*People* v. *Peckham,* 232 Cal.App.2d 163 [42 Cal.Rptr. 673].)

---

[1]Defendant testified he could not read.

However, it does not follow that the conviction must be automatically reversed because of this error, regardless of other evidence. (*People* v. *Dorado,* 62 Cal.2d 338, 356 [42 Cal.Rptr. 169, 398 P.2d 361].) ■ Unlike the improper receipt in evidence of a confession, improperly received admissions do not require a reversal unless the error has resulted in a miscarriage of justice. (*People* v. *Dorado, supra,* at p. 356; (*People* v. *Parham,* 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]; Cal. Const., art. VI, § 4½.) ■ The statement in question does not amount to a confession. Essentially, it is a declaration of defendant's belief that as an elderly man he was justified in defending himself. Unquestionably it does include some damaging admissions. ■ The recognized test we must apply is that "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error." (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]; *People* v. *Cruz,* 61 Cal.2d 861, 868 [40 Cal.Rptr. 841, 395 P.2d 889].) Therefore we must determine the effect of defendant's written admissions on the probable outcome of the proceedings.

2) *Reversible Error*

■ We conclude it is reasonably probable a more favorable result to the defendant would have been reached had the signed statement given to the police not been admitted in evidence. The statement suggested that no real struggle took place, that the deceased merely twisted defendant's arm and this so enraged defendant that he stabbed the deceased. This statement put a different light on the circumstances surrounding the knifing from that presented by defendant on the stand and lessened the likelihood of his testimony being accepted as true. When we disregard the defendant's signed statement at the police station and weigh the remaining evidence, including the testimony of the defendant, it appears reasonably probable the trial court might have accepted defendant's claim of justifiable homicide, in self-defense or in defense of habitation and property. (Pen. Code, § 197, subd. 2; *People* v. *Hubbard,* 64 Cal.App. 27, 35 [220 P. 315].)

The judgment is reversed.

Roth, P. J., and Herndon, J., concurred.