45 Cal.Rptr. 744]

[Crim. No. 4529. First Dist., Div. One. July 21, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. ROY GREEN, Defendant and Appellant.

Arnold H. Mentz, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Derald E. Granberg and Michael J. Phelan, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, J.—On this appeal from a judgment after conviction by a jury of murder in the first degree (Pen. Code, § 187) and a jury verdict determining that the penalty be life imprisonment, defendant raises several issues. We shall discuss the facts particularly pertinent to each of these issues in our separate consideration of the points raised on this appeal. Preliminarily, however, we set out the following basic facts as disclosed by the record:

1. *Events Prior to the Homicide*:

At around 3 o'clock in the afternoon on December 7, 1962, defendant and Eartis Beck, then defendant's brother-in-law, were sitting and conversing in the latter's automobile, which was parked in a supermarket parking lot on 98th Avenue and Edes Avenue in Oakland. Defendant had with him a musical instrument case. While they were sitting in the car, the victim, Leroy Scott, walked by. Defendant left the car to talk to Scott, and then the two returned to the car and told Beck that they were going to the cleaners. Beck noted that at this time defendant and Scott were "talking friendly and everything. . . ." Awhile later, after defendant picked up the musical instrument case which he had left in Beck's car, he and Scott went into the Nifty Doughnut Shop. Shortly there-

after, Beck entered the coffee shop to tell defendant and Scott that he was leaving. At this time Beck noted that defendant and Scott did not appear to be arguing or to have been arguing. Beck did testify, however, that he recalled defendant's having said to him in the automobile that "self-satisfaction was to him the greatest thing in the world" and that "if it would satisfy him to take Scott's life, he would do it."

Louise Marie Higgins, an employee of the Nifty Doughnut Shop, testified that defendant and Scott had been in the doughnut shop at about 5 p.m. on December 7; that defendant left the shop and returned shortly thereafter; that defendant and Scott left together at about 5 p.m.; and that while the two men were in the shop they appeared to be carrying on a friendly conversation without argument.

2. *The Homicide*:

Two eyewitnesses testified at the trial as to their observations at the time of the homicide. Julius M. Bankston, a friend of the victim, testified that between 4:30 and 5 p.m. on December 7, 1962, he encountered Scott with defendant on 98th Avenue. Bankston testified that defendant was carrying a clarinet case and that defendant and Scott appeared to be conversing in a normal and friendly manner. After being introduced to defendant by Scott, Bankston started to walk away and Scott joined him. As they were walking up the street, Scott began to look over his shoulder and suddenly ducked behind Bankston. When Bankston turned around, he saw defendant about 8 or 10 feet away pointing a gun at him. Bankston then moved sideways, and Scott, who had been behind Bankston saying " 'Wait a minute. Wait a minute. Hold it. Wait a minute,' " moved in the other direction. Defendant then fired at Scott and hit him in the stomach. As Scott stumbled, a revolver "fell from his possession." Bankston, however, testified that he at no time saw a gun in Scott's hands, nor did he hear Scott threaten defendant. Scott stumbled over to a nearby fence and fell over it. Defendant went over to him and pointed the gun at him, all the while swearing at Scott. Meanwhile, Scott was repeating, " 'Please don't; don't shoot. Please stop. Don't.' " Defendant fired at Scott while he was on the other side of the fence, and Scott then "scuffled" to the front steps of the adjacent house. Bankston testified that he saw defendant fire another shot at Scott at this time, and that after Scott had

reached the porch of the house, defendant picked up Scott's revolver and ran towards the freeway.

The homicide was also witnessed by Mrs. Mary O'Neill, who testified that while she was walking to the grocery store about 10 minutes to 5 p.m. on December 7, 1962, she observed three men walking towards her on the same side of the street on 98th Avenue. She testified that she saw defendant holding onto Scott and pushing him against a fence. As she crossed the street, she heard what she thought was a car backfiring, turned around and saw Bankston near the corner and Scott on the other side of the fence. She next saw defendant pointing a gun toward Scott over the fence, heard defendant say to Scott, "Get up, get up," and heard a shot fired over the fence. She then heard defendant say, "Get up, you dirty dog," and heard a second shot. Next she heard defendant say to Scott, "Jump," whereupon defendant again fired at Scott. Scott then stumbled up the steps of an adjacent house. At no time did Mrs. O'Neill see anything in the hands of Scott. After the last shot, Mrs. O'Neill testified that defendant walked back to the spot where the shooting began and picked up a jacket. Finally, after looking up the stairs at Scott, defendant walked by Mrs. O'Neill, twirling his gun in front of her as he passed.

Mrs. Pinkie McClain, who lived at 389 98th Avenue, testified that she was at her home at around 5 p.m. on December 7, 1962, and that she heard a commotion outside and a loud bang which sounded like a car backfiring. Moments later she heard the front screen door open, and when she looked outside, she saw a man lying on the steps between the screen door and the closed front door. Mrs. McClain also testified that she observed two Negro males leaving the area, one running toward the freeway. The following morning, Mrs. McClain found, outside her house, an expended cartridge case, which she gave to the police. When Oakland Police Officer Robert Attwood arrived at the scene of the shooting, he found the victim on the front steps of Mrs. McClain's house. Scott was moaning and was unable to speak. He had blood stains on the front of his shirt. Scott died from shock and hemorrhage due to a single gunshot wound in his abdomen.

3. *Defendant's Assault Upon his Wife*:

In addition to the evidence relating to the shooting itself and the events which preceded it, the record also contains the

testimony of various witnesses concerning an assault which defendant made upon his wife shortly after the homicide. Mrs. Annie Scott, a neighbor of defendant's wife, Mary Green, testified that around dinnertime on December 7, 1962, she went to Mrs. Green's home (actually the home of Mrs. Green's stepfather where Mrs. Green was living); that she heard Mrs. Green screaming inside; that in response to the order of a male voice, which Mrs. Scott believed to be that of defendant, Mrs. Green screamed to Mrs. Scott to "go away"; and that Mrs. Scott then went back to her house and called the police.

Officers Upton and Bunch of the Oakland Police Department, who made the arrest of defendant at his wife's home, testified that when they arrived there and looked through the window, they saw defendant holding his wife around the neck with one arm and trying to load an automatic pistol which he held in his hand. Bunch testified that before reaching the window, he heard a male voice, which he later ascertained to be that of defendant say, "I just shot your [unprintable] boyfriend; what do you think of that," or words to that effect. Defendant finally surrendered to the officers and was placed under arrest and taken to the police station. The gun which defendant was attempting to load when the officers arrived was subsequently tested by the police and determined to be the same gun from which the casings found at the scene of the homicide had been ejected.

### 4. *The Defense*:

By way of defense, defendant testified in his own behalf. His account of the events leading up to the killing of Scott was essentially the same as that presented by the prosecution, except that he testified that after he and Scott left the coffee shop, Scott began telling him about having relations with his wife in the presence of his child; that he was "pretty angry at that time"; that when Scott walked away with Bankston, defendant pulled his gun intending to hit Scott; that he then saw Scott with a gun, so he cocked his gun and fired; and that after he fired, he was afraid and continued to fire the gun.

### *Applicability of the Dorado Rule*

Following his arrest, defendant was taken from his wife's house by Officers Upton and Bunch and placed in the patrol wagon. While in the patrol wagon, defendant asked

Bunch whether Scott was dead. Bunch replied that he did not know. Defendant then stated, "I hope I killed the [unprintable]." En route to the police station the officers also took two written statements from defendant. The first of these statements, which was written by Bunch and read and signed by defendant, was as follows:[1] " 'I looked through the window and I saw him. I broke the window, he took off. I fired once at him around the corner. He went to turn another corner, I fired again two or three times. Then I came back to the house. I crawled through the broken window. I sure as [unprintable] was trying to hit him. Did I hit him? His name is Scott. First name is Ted. I met him through a cat named Howard. I don't know how my wife got hurt. I told her I just shot her [unprintable] boy friend.' "[2] " 'My reason is definitely because—— this is the only reason: Of what he told me on the phone about him [unprintable] my old lady in the presence of my child and also told me that the child was no longer mine because he had everything that I once had and also I understand that I have been wondering who was [unprintable] my old lady and now I know. That's why I shot him. The fact that I accepted him from the streets and he stayed at my house at 440-98th Avenue. Ramon Green. This was read to me, I read it and it is true. Ramon Green.' "

After defendant had given this written statement to Bunch, he told Upton that he wanted to give another statement because "it really didn't happen that way. . . ." This second written statement, which was taken by Upton and signed by defendant, reads as follows:[3] " 'I chased Scott down St. Elmo from my wife's house toward 98th Avenue. I shot at him once while I was on St. Elmo Street. Scott ran around the corner. I caught up with Scott when he crossed 98th Avenue. We were about eight feet apart. He reached into his pants and pulled out a gun. The gun fell on the ground. I shot Scott in the stomach. Then he jumped over the fence and I went back to the house. I'm sure I hit him. I don't see how I could have missed. This statement is free and voluntary.' "

 The evening of defendant's arrest, while he was at

---

[1] This statement was read to the jury by Bunch.

[2] After reading this portion of the statement Bunch testified as follows: "It is signed by the defendant twice. Then he wanted to add something else, so we went to the other side."

[3] This statement was read to the jury by Upton.

the Oakland Police Station, Deputy District Attorney John S. Mead questioned defendant concerning the homicide. Defendant's responses to the questions posed by Mead were recorded and later transcribed, but neither the transcript nor the tape recording was introduced into evidence or referred to by the prosecution during its case-in-chief. Portions of this transcript were, however, used for purposes of impeachment during the prosecution's cross-examination of defendant. The procedure followed by the prosecutor was as follows: Defendant was requested to read to himself from this statement; then certain questions and answers therefrom were read aloud by the prosecutor, who asked defendant whether those questions had been asked of him and whether he had given those answers. In each instance defendant responded in essence that he did not recall having been asked the particular question or having given such a reply. Upon the prosecution's rebuttal, Mead was called as a witness and testified that the subject statement had been taken by a dictaphone machine, the recording process consuming approximately 55 minutes; that only he and defendant had been present when the statement was taken; that the transcription of the recorded statement was a fair and true transcription of what had been said by himself and defendant; and that the questions previously read to defendant from the transcription of the recorded statements had been propounded by him to defendant and that the answers to such questions previously read to defendant from such transcription had been given by defendant.

Essentially, the subject statement given by defendant to Mead was that he had seen his wife with Scott; that his wife was partially naked; that he chased Scott from his wife's house; that he didn't intend to shoot Scott; that he saw Scott with a gun, saw Scott drop the gun, and then shot Scott. His statements concerning the shooting were specifically as follows: " 'And he went in his pocket and dropped his gun and I shot him. . . . He dropped his gun, see. The guy broke and ran and he dropped his gun and I shot him, and he jumped over the fence and I went back to the house. . . . Well, the only reason I shot at him, at the last time I didn't try to hit him because I'm a pretty good shot. At the last time the only reason I shot at him was because of the gun.' "

Defendant contends that the admission in evidence of these

statements made by him to the police constitutes reversible error in view of the rule announced in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. We consider this contention in light of the holding of *Dorado* and of the various subsequent cases which have interpreted and applied the *Dorado* rule. Following the decision of the United States Supreme Court in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], the California Supreme Court held in *Dorado* that a defendant's confession which was elicited under the following circumstances cannot be properly introduced in evidence: "(1) [T]he investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights." (Pp. 353-354.)

With respect to the requirement that an accused be advised of his right to counsel or to remain silent, the recent case of *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97], holds that we cannot presume, in the face of a silent record, that the police informed the defendant of these rights. ■ As to all four of the statements made by defendant, in the instant action, the record does not indicate that he was informed by the police of his right to counsel or of his right to remain silent. Accordingly, in the light of *Stewart,* we cannot presume that defendant was properly informed of his rights, and we must therefore consider the applicability of the *Dorado* rule to each of these statements.

■ Adverting to defendant's initial oral statement in the patrol wagon, we conclude that it does not fulfill the first and third requirements of *Dorado*. Therefore, its admission in evidence was not improper. This statement was voluntary and spontaneous and was not the result of a process of interrogations that lent itself to eliciting incriminating statements. (See *People* v. *Dorado, supra,* p. 354; *People* v. *Beverly,* 233 Cal.App.2d 702, 714 [43 Cal.Rptr. 743]; *People* v. *Martinez,* 233 Cal.App.2d 251, 254 [43 Cal.Rptr. 630]; *People* v. *Ghimenti,* 232 Cal.App.2d 76, 84 [42 Cal.Rptr. 504].) Moreover, while at the time defendant made this statement he was under arrest for the assault upon his wife

and the investigation had focused upon him for that crime, the investigation had not then focused upon him as a suspect in the homicide. (See *People* v. *Clapper*, 233 Cal.App.2d 34, 37 [43 Cal.Rptr. 105].) While the officers were aware that a "shooting" had taken place on 98th Avenue (since they were originally proceeding toward the scene of the "shooting" when they were diverted by a radio call advising them of the disturbance on St. Elmo Drive); while, according to their testimony, they suspected that there was some connection between the shooting and the call to which they were responding; and while they had overheard defendant state to his wife that he had shot her boyfriend, these officers had undertaken no investigation of the shooting and consequently possessed no information concerning this crime other than the fact that it had taken place. Under these circumstances, therefore, insofar as these officers were concerned, at the time defendant made his initial oral statement to them, the shooting was an unsolved crime and the investigation thereof had not focused on defendant.

Turning to the written statements which defendant thereafter made in the patrol wagon en route to the police station, we conclude that these fulfill the four requirements of *Dorado*. As already pointed out the fourth requirement is present. The second requirement of custody is also present since defendant was under arrest at the time. While generally an arrest fulfills, in addition, the first requirement that the investigation have begun to focus on a particular suspect (*People* v. *Stewart, supra,* p. 577), as we have indicated, this requirement was not fulfilled in the instant case upon defendant's arrest. However, when subsequent to his arrest, defendant himself inquired as to whether Scott was dead and stated that he hoped he had killed him, the officers did become aware of defendant's connection with the homicide. In view of their previous knowledge that a shooting had taken place, the effect of defendant's initial statement was to focus the investigation upon himself as a suspect in the subject homicide so as to bring his written statements within the first requirement of the *Dorado* rule.

Regarding the third requirement that the officers have undertaken a process of interrogations that lends itself to eliciting incriminating statements, in *Stewart* the Supreme Court stated that the applicable test in ascertaining whether this requirement of the *Dorado* rule has been fulfilled is not dependent upon "a determination of the actual intent or sub-

jective purpose of the police in undertaking the interrogations but a determination based upon the objective evidence." (P. 579.) In addition, *Stewart* holds that this determination turns upon an analysis of "the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." (P. 579.)

█ Concerning ourselves with the facts of the instant case, we have some difficulty determining whether this requirement of *Dorado* had been fulfilled in relation to the written statements made by defendant in the patrol wagon. As regards the first of these two statements, the only evidence in the record with respect to the manner in which it was elicited is Upton's testimony on cross-examination that "We had other conversation in the back of the wagon. . . . [W]e spoke of other things. I don't recall just how the questions and answers went, but we discussed the matter." From this testimony it appears at least that this statement was obtained as the result of a process of interrogations consisting of questions by the police and answers by defendant. In *People* v. *North*, 233 Cal.App.2d 884 [44 Cal.Rptr. 123], the reviewing court was confronted with a record totally devoid of "objective evidence" so as to preclude an analyzation of the "total situation" required by the *Stewart* test. Alluding to the statement in *Stewart* that in "most cases" an interrogation by the police lends itself to eliciting incriminating statements, the appellate court there held that "in the absence of any contrary showing thereon in the record" it could not presume that the case was "one of the 'rare' or 'unusual' cases in which it did not so lend itself." (P. 888.) Although in the instant case the record is not "totally" devoid of objective evidence relating to any of the "factors" required by the *Stewart* test, the record is so scanty with respect to these "factors" that we do not have enough objective evidence upon which to make the required "total" analysis. Accordingly, in the light of the principle announced in *North* we must assume that the subject interrogation in the present case was one that lent itself to eliciting incriminating statements.

█ Insofar as the second written statement is concerned, the record is likewise unclear as to the circumstances under which it was obtained. Although, according to Upton's testimony, defendant volunteered this statement as the true ac-

count of the homicide, the record discloses that it was given to correct the first written statement. Accordingly, since we have concluded that this previous statement was obtained pursuant to a process of interrogations lending itself to the eliciting of incriminating statements, and since the second statement was interrelated with the first, we must in the total absence of any evidence to the contrary assume also that the second statement was elicited by such a process of interrogations.

Turning to the legal effect of these two written statements, since they were given in close proximity and since the second was given purportedly to correct and amend the first, we are of the opinion that the two must be treated as one statement. Although the first statement purported to be a confession, defendant then stated that "it really didn't happen that way. . . ." In the subsequent statement, while he admitted shooting Scott, he also stated that when he caught up with Scott and they were "about eight feet apart" Scott "reached into his pants and pulled out a gun." This statement is susceptible of the inference that defendant acted in self-defense.[4] "When a statement of guilty conduct is such that it contains only facts from which guilt may be inferred or facts amounting to a claim of innocence or justification or excuse for the defendant's acts, it is an admission rather than a confession." (*People* v. *Beverly, supra,* 233 Cal.App.2d 702, 712; *People* v. *Elder,* 55 Cal.App. 644, 647 [204 P. 29]; *People* v. *Luzovich,* 127 Cal.App. 465, 469 [16 P.2d 144]; *People* v. *Fowler,* 178 Cal. 657, 664-665 [174 P. 892]; *People* v. *Wilkins,* 158 Cal. 530, 534-535 [111 P. 612]; and see *People* v. *Ferdinand,* 194 Cal. 555, 568-569 [229 P. 341]; *People* v. *Speaks,* 156 Cal.App.2d 25, 34 [319 P.2d 709]; and *People* v. *Beverly, supra,* as to the distinction between a confession and an admission.)

It is error to admit into evidence admissions as well as confessions which have been obtained in violation of the *Dorado* rule. (*People* v. *Dorado, supra,* pp. 356-357; *People* v. *Hillery,* 62 Cal.2d 692, 710-712 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Beverly, supra,* p. 713.) However, in the case of admissions the error is not necessarily prejudicial and the harmless error rule announced in *People* v. *Watson,*

---

[4]It should be here noted that while testifying in his own defense defendant stated that Scott had a gun and that the trial court instructed the jury on self-defense as justification for homicide.

46 Cal.2d 818, 835-838 [299 P.2d 243], applied with due regard to the provisions of article VI, section 4½, of the California Constitution, is applicable. (*People* v. *Hillery, supra,* pp. 710-712; *People* v. *Beverly, supra,* p. 713; *People* v. *Schader,* 62 Cal.2d 716, 728 [44 Cal.Rptr. 193, 401 P.2d 665].) Accordingly, we shall hereinafter discuss whether the subject error caused prejudice to defendant.

▮ Concerning defendant's fourth statement, namely, that which he made to Mead, it is clear that it fulfills all four of the *Dorado* requirements. The fact that this statement was used by the prosecution to impeach defendant rather than as part of its case-in-chief does not prevent the application of *Dorado.* In propounding the exclusionary rule, *Dorado* makes no distinction with respect to the purpose for which an incriminating statement is introduced at a trial. In the present case the portions of the statement introduced in evidence solely for the purpose of impeachment tended to disprove defendant's testimony at the trial and to establish his incredibility. As such they were incriminating statements or admissions. (*People* v. *Burns,* 232 Cal.App.2d 587, 589 [43 Cal.Rptr. 84]; *People* v. *Reid,* 233 Cal.App.2d 163, 178-180 [43 Cal. Rptr. 379]; and see *People* v. *Underwood,* 61 Cal.2d 113, 120-121 [37 Cal.Rptr. 313, 389 P.2d 937]; and see also *People* v. *Atchley,* 53 Cal.2d 160, 170 [346 P.2d 764]; 3 Wigmore, Evidence (1940) § 821, pp. 238, 241-242.)

In *Underwood,* it was held that involuntary admissions are not admissible to impeach the testimony of the accused. The People urge that a distinction should be made between the type of admission considered in *Underwood* and that involved here, that is, as between an involuntary admission, on the one hand, and a voluntary admission obtained without advising the accused of his right to counsel or to remain silent, on the other. The thrust of the People's argument is that confessions or admissions obtained by coercion are untruthful because coerced, but that this unreliability is not inherent in confessions or admissions obtained under the proscription of *Dorado.* Although our Supreme Court in *In re Lopez,* 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380], recognized the distinction as a basis for its holding that the *Dorado* rule is not to be applied retroactively, *Lopez* clearly emphasizes the salutary objectives of the *Dorado* rule in its prospective application. We perceive nothing in the language of *Dorado, Lopez, Stewart,* or in any of the cases which have considered the *Dorado* rule which suggests or indicates that

any distinction should be made as between the affirmative use of admissions obtained contrary to the proscription of *Dorado* and the use of such admissions by way of impeachment. We are further impelled to this conclusion by the unequivocal language in *Escobedo* that *"no statement* elicited by the police during the interrogation *may be used against him* [the defendant] at a criminal trial.'' (Italics added; p.491.)

The People contend that the subject statement could be used for impeachment purposes under the authority of *Bailey* v. *United States,* 328 F.2d 542. It should be here noted, primarily, that *Bailey* was decided prior to *Escobedo* and that it did not involve an incriminating statement obtained without protection of counsel.[5] In *Bailey,* the reviewing court was called upon to apply the rule announced in *Mallory* v. *United States,* 354 U.S. 449 [77 S.Ct. 1356, 1 L.Ed.2d 1479], that incriminating statements elicited from defendants during a period of unlawful detention are rendered inadmissible. It was held in *Bailey* that since the statement there involved was voluntarily given at the inception of the defendant's detention, it was given while he was lawfully detained and was not rendered inadmissible in spite of the fact that his detention during the subsequent period might have been unlawful. Although not necessary to its decision, the reviewing court in *Bailey* noted that since the subject statement was offered to impeach the defendant it could be used for that purpose even if the statement had been unlawfully obtained. Although upon analogy it would appear that this last-mentioned holding would likewise be applicable in a situation where a statement is obtained without informing a defendant of his right to counsel and to remain silent, we are satisfied, in the light of the clear holding in *Escobedo,* that the distinction made by *Bailey* between a statement used affirmatively and one used for impeachment purposes is no longer applicable.

### Misconduct of Prosecuting Attorney

Several assignments of misconduct on the part of the prosecution are made by defendant. First, it is urged that it was prejudicial misconduct for the prosecutor to state in his opening statement that Scott was a student, when he failed to offer proof of this fact.　　The rules with relation to

---

[5]In *Bailey,* the defendant *was* informed that he need not make a statement and that he could remain silent.

the proper scope of an opening statement require that an attorney refrain from referring to facts which he cannot or will not be permitted to prove. (*People* v. *Ramsey,* 172 Cal. App.2d 266, 272 [342 P.2d 287]; *People* v. *Chester,* 142 Cal. App.2d 567, 574 [298 P.2d 695].) However, the failure of a party to produce proffered evidence because of the rules of evidence, or for any other reason, does not necessarily indicate prejudice. (*People* v. *Ramsey, supra,* p. 272; *People* v. *Planagan,* 65 Cal.App.2d 371, 406-407 [150 P.2d 927].) Because of the limitations upon the effect of the opening statement, i.e., it cannot be considered as evidence and does not bind anyone by its recitals, one who asserts misconduct based upon statements made during this opening statement must prove more than the mere failure to adduce the testimony described therein. (*People* v. *Ramsey, supra,* p. 272.) It must be shown that the statement was made in bad faith or without intention of trying to support it by evidence. "In the absence of such showing it cannot be said the district attorney was guilty of misconduct because he failed to produce such evidence." (*People* v. *Wong Hing,* 176 Cal. 699, 703 [169 P. 357]; *People* v. *Berryman,* 6 Cal.2d 331, 336 [57 P.2d 136].) In the instant case, we find no evidence indicating that the prosecutor was acting in bad faith when he made the statement concerning Scott's status as a student. In any event, the making of such statement can hardly be considered prejudicial to defendant.

Defendant's second assignment of error relating to misconduct is based on the prosecutor's remarks in his argument to the jury that Scott's gun was not loaded.[6] Defendant argues that since there was no evidence in the record to the effect that Scott's gun was unloaded, the prosecutor was guilty of misconduct in arguing this fact to the jury, thereby "wrongfully impressing the jury that the decedent had no reason to pull his gun." It is well settled that misconduct in argument may not be assigned as error on appeal if it was not so urged at the trial, unless the misconduct contributed to the verdict or was so unreasonable that it could not have been cured. (*People* v. *Berryman, supra,* p. 337; *People* v. *Beverly, supra,* 233 Cal.App.2d 702, 723-724; *People* v. *Rosoto,* 58 Cal.2d 304, 357 [23

---

[6]Specificall) the prosecuting attorney made the following remarks: "The second excuse he gave you was the fact that the victim, Mr. Scott, had this pistol. Well, so far as we know, the pistol was unloaded." "As far as you are concerned, there is no testimony at all it is loaded, so the gun is unloaded."

Cal.Rptr. 779, 373 P.2d 867].) In the instant case, defendant's counsel made no objection at the trial to these remarks by the prosecutor; nor do we believe that the misconduct was so gross as to be unredeemable. Had defendant objected, the subject remarks could have been cured by retraction or by an appropriate instruction of the court. We conclude, therefore, that the statements made by the prosecutor in his argument to the jury do not constitute prejudicial error.

 Defendant's next contention is that the prosecuting attorney acted improperly in calling defendant's wife as a witness, thereby compelling defense counsel to object in open court to her testifying, and giving the jury the impression that Mrs. Green, if allowed to testify, would testify against defendant. In support of his argument, defendant cites only the case of *People* v. *Solis,* 193 Cal.App.2d 68 [13 Cal.Rptr. 813]. In *Solis,* the prosecuting attorney called the defendant's wife to the stand, after counsel for the defendant had stated to the trial judge in chambers, and in the presence of the deputy district attorney, that he wanted the record to show that "the defendant will object to the calling of the wife as a witness. . . ." (P. 70.) When the prosecution thereafter called the wife as a witness the trial court sustained the defendant's objection. The appellate court, noting the holdings in several cases that " 'the proper procedure is to offer the spouse as a witness, subject to the claim of privilege by the defendant' " (citing *People* v. *Klor,* 32 Cal.2d 658, 663 [197 P.2d 705]; *People* v. *Bigelow,* 165 Cal. App.2d 407, 416 [332 P.2d 162]; *People* v. *Chand,* 116 Cal. App.2d 242, 251 [253 P.2d 499]; *People* v. *Carmelo,* 94 Cal. App.2d 301, 305-306 [210 P.2d 538]; *People* v. *Moore,* 111 Cal.App. 632, 634 [295 P. 1039]), held, nevertheless, that in the case before it the calling of the wife constituted error because "the People knew in advance that such procedure would serve no purpose except unfairly to prejudice the appellant." (P. 77.) Observing that this conduct was inherently unfair, since the jury could infer that if the wife had been allowed to testify she would have testified against her husband, the reviewing court held it to constitute reversible error "*in the light of the entire record.*" (P. 78; italics added.)

In the instant case the prosecutor was apparently under the impression that since defendant had committed an act of violence upon his wife, the language "cases of criminal

violence'' in Penal Code section 1322[7] was broad enough to permit her to testify against defendant because such violence was relevant to the crime herein charged. In other words, it was the opinion of the prosecutor that this exception to the spousal privilege relating to ''cases of criminal violence'' is not necessarily confined to cases wherein the husband is being prosecuted for such violence. This position was urged upon the trial court in chambers prior to the calling of Mrs. Green as a witness. At that time the court indicated a tentative ruling in favor of defendant on the issue, but invited both parties to submit further authorities ''before we actually encounter this matter of law by way of the calling of the witness.'' Subsequently during the course of the trial the judge made the following statement in open court: ''Gentlemen, will we reach the calling of Mrs. Green?'' Mrs. Green was thereafter called and sworn as a witness and defendant objected to her testimony on the ground of privilege. After permitting the prosecutor to ask the witness whether she was the wife of defendant,[8] the trial court declared a recess for the purpose of discussing defendant's objection in chambers. The trial judge thereupon indicated that defendant's objection would be sustained. When the trial resumed the prosecutor asked leave to ask ''one more question'' before the court made its ruling. Leave being granted, the prosecutor asked Mrs. Green ''do you personally object to testifying in this matter?'', and she replied ''No.'' No objection was interposed to this question by defendant. Thereupon the court sustained defendant's objection on the ground of privilege and excused Mrs. Green as a witness.

We are of the opinion that the trial court was correct in its ruling since the exception to the privilege rule was not applicable because the instant case was not one in which defendant was being prosecuted for a crime or act of criminal violence upon his wife. We are satisfied both from the language of section 1322 and the cases which have discussed the application of this section that where one spouse has committed a crime or an act of criminal violence upon the other the latter may testify against the former only in the action

---

[7]Pen. Code, § 1322, in pertinent part provides: ''Neither husband nor wife is a competent witness for or against the other . . . except . . . in case of criminal actions or proceedings for a crime committed by one against the person . . . of the other, . . . or in cases of criminal violence upon one by the other. . . .''

[8]Mrs. Green testified that she had obtained an interlocutory decree of divorce from defendant.

wherein the offending spouse is being prosecuted for such crime or act. (See *Young* v. *Superior Court,* 190 Cal.App.2d 759, 761-762 [12 Cal.Rptr. 331]; *People* v. *Tidwell,* 61 Cal. App.2d 58, 60-61 [141 P.2d 969]; *People* v. *Ford,* 60 Cal.2d 772, 785 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Rader,* 24 Cal.App. 477, 484 [141 P. 958]; *Matter of Application of Kantrowitz,* 24 Cal.App. 203, 205 [140 P. 1078].)

However, in the light of the rule stated in *People* v. *Klor, supra,* 32 Cal.2d 658, that the proper method of handling the privilege problem is to offer the spouse as a witness subject to the claim of privilege by the defendant, and in light of the fact that in the instant case there is no evidence of or indication of bad faith on the part of the prosecutor in calling defendant's wife to the stand, we are satisfied that the prosecutor was not guilty of misconduct in calling Mrs. Green to the stand. The procedure followed in the instant case was apparently considered by the court to be the proper one since it permitted Mrs. Green to take the stand and reserved its ruling until such time as the privilege was formally invoked. Accordingly, we do not have the deliberate attempt which constituted the vice of the prosecutor's conduct in *People* v. *Solis, supra,* 193 Cal.App.2d 68. The feature which distinguishes *Solis* from the instant case is that there the prosecutor definitely knew that the defendant's wife could not testify since her husband had committed no crime or act of violence against her.

In addition, in the instant action, all the facts concerning defendant's assault upon his wife were brought out during the trial by the testimony of defendant himself, and that of Bunch and Upton, who witnessed the assault. This testimony was determined by the trial court to be admissible to show defendant's state of mind at the time he shot Scott. The fact, therefore, that the jury would probably infer that Mrs. Green, if she had been allowed to testify, would testify against defendant cannot be considered prejudicial when all of these unfavorable facts to which she might have testified were established by other witnesses.

Defendant also claims that prejudicial error was committed by the prosecutor in questioning Mrs. Green as to whether she objected to testifying.[9] This conduct, while im-

---

[9] This question was apparently asked to establish the consent required by Pen. Code, § 1322, which provides, in pertinent part, that ''Neither husband nor wife is a competent witness for or against the other in a criminal action . . . except with the consent of both. . . .''

proper, did not constitute prejudicial error. As previously noted, the question was not objected to by defendant. Moreover, the misconduct was redeemable, and it was so redeemed when the trial court later struck the question and answer from the record upon defendant's motion and admonished the jury to disregard that portion of the record in its entirety.

Finally, defendant assigns as misconduct the statement, "Did Mrs. Green ever explain any affair to you whatsoever with Mr. Scott?", made by the prosecutor in his closing argument to the jury. This statement was obviously made with the intent to create in the minds of the jury the inference that because Mrs. Green did not testify there was no evidence of any such affair. It was deliberately made with knowledge that, aside from her testimony as to her marital status, Mrs. Green had not been permitted to testify. A timely objection was made by defendant to this statement and the court then admonished the prosecutor to "keep within the record." With a persistence bordering on insolence, the prosecutor then stated: "You saw Mrs. Green. . . . She was here. She was called as a witness, and you know what questions she was asked. I am not beyond the record. You know yourselves." Under the circumstances, the subject statements were clearly unfair innuendos. The question of whether such misconduct constituted reversible error will be subsequently discussed in connection with the other errors we have hereinbefore found to exist in this case and in our evaluation of these errors in the light of the entire record.

### The Admission of the "Sympathy Card" Into Evidence

The prosecution introduced into evidence a "sympathy card" which was found in defendant's musical instrument case at the scene of the homicide. The card read, "To comfort you. With deepest sympathy in the loss of your dear one." Hugh Green, the proprietor of the Ben Franklin Variety Store, which is adjacent to the Nifty Doughnut Shop, identified the card as one which his store sold, the paper bag in which the card was found as the type used in his store, and the receipt found in the bag as from the cash register in his store. The receipt bore the date December 8, but Green stated that it could have been issued at any time after 5 p.m. on December 7.

Defendant contends that the evidence demonstrated that it was impossible for him to have purchased this card (based on

the testimony concerning the time when the card could have been purchased and the testimony of other witnesses indicating the probable time of the homicide), and that, therefore, it was prejudicial error to admit it in evidence over objection.

We have concluded, however, that there is testimony in the record from which the jury could determine that the card was purchased by defendant. First, it was uncontradicted that the card was found in defendant's musical instrument case, which he left at the scene of the homicide. While, as defendant argues, the card could have been placed in the case by any one of the number of persons who collected at the scene of the homicide, the jury could also infer that the card was placed in the case by defendant. In addition, Louise Higgins, the employee of the coffee shop, testified that defendant and Scott were in the shop "around" 5 p.m., that defendant left by himself and then came back, and that defendant and Scott left together "around" 5 p.m. It is possible, therefore, that defendant could have purchased the card from the variety store, which was directly adjacent to the doughnut shop, around 5 p.m., but prior to the homicide.

The evidence detailed by defendant in support of his contention that the card should not have been admitted in evidence suggests at most that it was possible that defendant did not purchase the card. But where, as here, there is evidence leading to the conclusion that defendant could have purchased the card and this evidence is not so improbable as to be entirely unworthy of belief, the conflict was a question for the jury to resolve. Accordingly, we conclude that the trial court ruled properly in allowing the card to be admitted in evidence, the comment of the court being, ". . . I feel the objection addresses itself more to weight rather than admissibility."

### Sufficiency of the Evidence

Defendant's last argument is that the evidence is insufficient to support a conviction for premeditated murder, but that it is clear that he acted in the "heat of passion," so as to reduce his crime to voluntary manslaughter. ▇ In reviewing the sufficiency of the evidence to support a jury verdict, this court must assume in favor of the verdict the existence of every fact which the jury could reasonably have deduced from the evidence. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Rosoto, supra,* 58 Cal.2d 304, 321.)

▇ Our review of the evidence leads us to the conclusion

that there was ample evidence from which the jury could return a verdict of first-degree murder. Specifically, we note the testimony of the eyewitnesses as to the gruesome manner in which the homicide took place. In addition, we note the statements which defendant made to Beck that he would kill Scott if it satisfied him to do so; the inferences that could be drawn from the sympathy card; and the testimony of Mrs. Green's stepfather to the effect that defendant stated to him about two weeks before the homicide that " 'I will kill her [Mrs. Green] if it's the last thing I do,' " this testimony suggesting that defendant either knew or suspected much in advance of the homicide that his wife was having an illicit relationship with another man.

### Summary

The final question which presents itself is whether the errors in the instant case require a reversal. These consist of the erroneous admission into evidence by virtue of the *Dorado* rule of the two written statements made to the police officers in the patrol wagon and the statement made to the deputy district attorney, and of the misconduct occasioned by the prosecutor's argument to the jury concerning the inference to be drawn from Mrs. Green's failure to testify. As already pointed out, none of the subject statements made by defendant was a confession, and, therefore, their admission into evidence was not prejudicial per se. ▮ Since admissions erroneously admitted in violation of the *Dorado* rule are not necessarily prejudicial we must determine whether it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836; Cal. Const., art. VI, § 4½.) This determination must likewise be made with respect to the prosecutor's misconduct in his closing argument.

▮ Considering first the erroneous admission into evidence of defendant's statements, upon an examination of the record in this case, we conclude that it cannot be said that there was a miscarriage of justice, since it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. The record points emphatically to defendant's guilt. In addition to testimony of the two eyewitnesses to the homicide, the record contains Beck's testimony as to defendant's statement that "if it would satisfy him to take Scott's life, he would do it": the testimony of Bunch that as he approached Mrs. Green's house, he heard defendant state to his wife that he had shot her

boyfriend; and the spontaneous inquiry by defendant made to Bunch in the patrol wagon as to whether Scott was dead and defendant's unsolicited statement that he hoped he had killed Scott. This latter statement amounted to an admission of guilt involving criminal intent, and, as such, constituted a confession. (*People* v. *Speaks, supra,* 156 Cal. App.2d 25, 34-35; *People* v. *Elder, supra,* 55 Cal.App. 644, 646; *People* v. *Miller,* 135 Cal. 69, 70-71 [67 P. 12].) In *Elder,* where the defendant was convicted of murder in the first degree, a statement by the defendant that he shot his wife twice and that he was very sorry for what had happened and that he hoped his wife would get well was held to constitute a confession and sufficient to sustain the verdict which the jury returned since the specific intent to kill would be presumed from the guilty conduct admitted by him.

 Insofar as the present case is concerned, the subsequent written statements taken from defendant in the patrol wagon are exculpatory in nature and may be regarded as a justification or excuse for the homicide since they negatived criminal intent in relation to defendant's conduct. These statements also amount to an acknowledgment of the shooting accompanied by a claim that the homicide was committed in self-defense. This is substantially the essence of the statement defendant made to Mead and is the theory upon which defendant based his defense at trial and upon which he sought to justify the homicide when he became a witness in his own behalf. Aside from the initial confession to the police, the introduced statements, as well as defendant's testimony at the trial, were such that, if believed by the jury, they would have exonerated defendant from guilt. Insofar as the statement offered for impeachment is concerned, the inconsistencies between this statement, on the one hand, and the two written statements made in the patrol wagon and defendant's testimony, on the other, are minor and of little significance in the light of the overwhelming evidence of guilt established by defendant's properly admitted extrajudicial confession, the testimony of witnesses and the other properly admitted evidence. In the instant case it cannot be said, moreover, that defendant's testimony was impelled by the erroneous admission of the extrajudicial admissions since the latter were virtually identical with defendant's explanation at the trial. If defendant's testimony was in any way impelled by his extrajudicial statements it is apparent that it was impelled by the properly admitted extrajudicial con-

fession since his testimony at the trial was exculpatory in nature and substantially less incriminating than his confession to Bunch.

Insofar as the prosecutor's misconduct in his closing argument is concerned, we cannot see how his statement with respect to Mrs. Green's inability to testify regarding the alleged affair with Scott could have resulted in any verdict other than that rendered by the jury. Although the innuendo sought to be implanted by the prosecutor was that if Mrs. Green had been permitted to testify she would have denied any illicit relationship with Scott, the only evidence in the case which the jury might consider in this regard was that offered by defendant himself. The prosecutor's statement was not evidence, and the jury was specifically instructed that statements of counsel are not evidence and that it should disregard such statements which are not supported by the evidence. Moreover, the statement by the court at the time the objection was interposed that the prosecutor was outside the record indicated to the jury that the subject statement should be disregarded. In the absence of any indication to the contrary we must presume that the jury followed the court's instructions. Under the circumstances and in view of the overwhelming evidence of guilt, there is no reasonable probability that the jury would have reached a result more favorable to defendant if the subject statement had not been made.

The judgment is affirmed. The appeal from the order denying defendant's motion for new trial is dismissed.

Sullivan, P. J., and Sims, J., concurred.

A petition for a rehearing was denied August 11, 1965.