[Crim. No. 13370. Second Dist., Div. Five. Sept. 24, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. PAT GARDNER, Defendant and Appellant.

Gilbert F. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Andrea Sheridan Ordin, Deputy Attorney General, for Plaintiff and Respondent.

AISO, J. pro tem.*—The trial court, sitting without a jury, found defendant Pat Gardner guilty of a violation of section 11501 of the Health and Safety Code (selling, furnishing, or giving away a narcotic). Following a temporary commitment for diagnostic purposes (Pen. Code, § 1203.03), her request for probation was denied, and she was sentenced to state prison.[1] She appeals from the final judgment of conviction.

Defendant has advanced several contentions of error. We have concluded that the admission of the testimony of Sergeant W. E. Loeber, Jr., of the Los Angeles Police Department Narcotics Detail as a rebuttal prosecution witness constituted prejudicial and harmful error as claimed by defendant compelling a reversal under *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. Since the other claimed errors are not likely to arise in the event of a retrial, we consider here only this one issue.

Sergeant Loeber testified over defense objection that when he interrogated the defendant in connection with an earlier charge of using narcotics illegally (Health & Saf. Code, § 11721), he observed scabs and scar tissue on defendant's arms which he opined as having been caused by narcotics' injections, that defendant admitted she had been using heroin on and off for a period of 10 years, and that her last injection was just two days prior to the interview. The interview or interrogation took place at 10:40 a.m. on January 22, 1965, less than 24 hours after her arrest without warrant on January 21, and while confined in jail. The arrest was subsequently judicially determined to be illegal for lack of reasonable and probable cause and the misdemeanor charge thereupon dismissed. The record furthermore fails to affirma-

---

[1]The sentencing judge was not the one who presided over the taking of evidence and who made the finding of guilt; defendant, however, registers no complaint in this regard.

*Assigned by the Chairman of the Judicial Council.

tively show that defendant's confession was preceded by any warning[2] of her rights under *People* v. *Dorado*[3] (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 389 P.2d 361].

██ Lacking any adequate warning and waiver of defendant's *Dorado* rights, the facts in this case are distinguishable from those in *People* v. *Martin* (1966) 240 Cal.App.2d 653 [49 Cal.Rptr. 888] cited by the People both in the trial court and in their appeal brief. Under *Dorado* the statements were obtained in violation of defendant's right to counsel under the Sixth Amendment. Since the statements were obtained during an illegal confinement, absent an adequate showing that the illegal arrest and confinement had been attenuated as a causative factor, the statements were also inadmissible because of their derivative illegality. (*People* v. *Bilderbach* (1965) 62 Cal.2d 757, 767-768 [44 Cal.Rptr. 313, 401 P.2d 921].) The statements also followed Sergeant Loeber's illegal observation of defendant's scabs and scar tissues and the People did not negative the causative relationship between his observations and defendant's statements. (*Fahy* v. *Connecticut* (1963) 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229].)

██ Sergeant Loeber's observation of defendant's arms would not have occurred if defendant had not been held in illegal custody. It was an exploitation of an illegal arrest. "[T]estimony as to matters observed during an unlawful invasion has been excluded in order to enforce the basic constitutional policies." (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 485 [9 L.Ed.2d 441, 453, 83 S.Ct. 407].) Testimony of Sergeant Loeber's observation of scabs and scar tissues on defendant's arms should have been excluded. (*People* v. *Sesslin* (1968) 68 Cal.2d 418, 426-431 [67 Cal.Rptr. 409, 439 P.2d 321].) Although a handwriting exemplar is not within the protection of the Fifth Amendment privilege because of its non-testimonial nature, *Sesslin* nevertheless held the exemplar and its derivative "fruit" inadmissible because it was ob-

---

[2]Gary C. Bebee, a police officer of the City of Los Angeles, who arrested the defendant and another woman, Lynn Iverson, about 1:55 p.m. on January 21, 1965, testified that upon defendant's arrest, he advised her "that she had the right to remain silent, that she was entitled to the services of an attorney before making any statements, and anything she said could be used against her." However, this witness was withdrawn by the prosecution before completion of his direct testimony and before cross-examination.

[3]The trial (taking of evidence) in this case took place between April 25, 1966 and May 5, 1966, so *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] is not applicable to the proceedings under review. (*Johnson* v. *New Jersey* (1966) 384 U.S. 719, 734 [16 L.Ed.2d 882, 892, 86 S.Ct. 1772]; *People* v. *Rollins* (1967) 65 Cal.2d 681, 683 [56 Cal.Rptr. 293, 423 P.2d 221].)

tained while the accused was being held under an illegal arrest. We appreciate the fact that the trial court made its ruling as to the admissibility of Sergeant Loeber's observations without benefit of the *Sesslin* opinion of April 10, 1968, but it nevertheless controls this case still in process of direct review when the *Sesslin* decision was rendered. (*Linkletter* v. *Walker* (1965) 381 U.S. 618, 622, fn. 3 [14 L.Ed.2d 601, 604, 85 S.Ct. 1731].)

The trial court appears to have been of the opinion that statements voluntarily made (noncoerced) may be admitted for the limited purposes of impeachment to offset possible perjury,[4] even though the statements had been obtained in violation of *Dorado*. If the statements had been made in the course of investigation of the charge upon which defendant was being tried in this case, the court would have been clearly wrong. An admission even if uncoerced, but in violation of *Dorado*, had it been obtained in the course of investigation of the charge being tried, would have been clearly inadmissible even for impeachment purposes. (*People* v. *Green* (1965) 236 Cal.App.2d 1, 16-17 [45 Cal.Rptr. 744]; *People* v. *Barry* (1965) 237 Cal.App.2d 154, 161 [46 Cal.Rptr. 727]; *People* v. *Zavala* (1966) 239 Cal.App.2d 732, 745 [49 Cal.Rptr. 129]; *Groshart* v. *United States* (9th Cir. 1968) 392 F.2d 172; *Wheeler* v. *United States* (10th Cir. 1967) 382 F.2d 998, 1001; *Commonwealth* v. *Padgett* (1968) 428 Pa. 229 [237 A.2d 209, 210]; *State* v. *Brewton* (1967) 247 Ore. 241 [422 P.2d 581, 583], cert.den., 387 U.S. 943 [18 L.Ed.2d 1328, 87 S.Ct. 2074].)

The finding by the trial court in this case that the statements were voluntarily made (noncoerced) was not a determination whether a *Dorado* or *Sesslin* type of constitutional violation had been exploited or whether the causative effect of the violation had been attenuated as required by *Wong Sun* v. *United States* (1963) *supra,* 371 U.S. 471.[5] (*People* v. *Bilder-*

---

[4]Cf. *Simmons* v. *United States* (1968) 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967].

[5]The pertinent part of the colloquy between court and counsel in this respect was as follows:

"[DEFENSE COUNSEL]: . . . No statements could have been made by this defendant either voluntary or involuntary but for the illegal action of the police department, the police officer in this connection. [¶] So regardless of what her statements were to this officer while she is in custody on a charge of which the trier of fact has already found there was no probable cause for arrest, I do not feel that could be used against her in any type of a case. [¶] This would be then saying if the Court will allow this, it appears to me the Court is saying, 'Well, the officers can make an illegal arrest, they cannot use the evidence directly against her,

*bach* (1965) *supra,* 62 Cal.2d 757, 767-768; *People* v. *Green* (1965) 236 Cal.App.2d 1, 16-17 [45 Cal.Rptr. 744].)

Does the fact that the illegal observation and the statements were obtained in an earlier and separate criminal action, which was the situation in *Walder* v. *United States* (1954) 347 U.S. 62 [98 L.Ed. 503, 74 S.Ct. 354], and in this case, introduce a material factor rendering the rules discussed above inapplicable? In *People* v. *Haston* (1968) 69 Cal.2d 418, 426-431 [70 Cal.Rptr. 419, 444 P.2d 91], our Supreme Court held in the negative where the confession or statement is used to establish an element necessary for a conviction on the current charge on trial., We see no reason for making a distinction even where the later use is limited to impeachment purposes, for the same reasons illegal statements obtained in course of investigation of the charge on trial may not be used for impeachment. Furthermore, here the inherent nature of the statements was such that they logically were not susceptible to confinement for impeachment purposes only.

 Prior misdemeanor narcotics offenses are deemed probative of the requisite knowledge of the narcotic nature of the substance possessed. (See e.g. *People* v. *Linyard* (1957) 151 Cal.App.2d 50, 55 [311 P.2d 57].) The same test of relevancy would apply to confessions or admissions concerning the prior use of narcotics.

The *Walder* case has been held recently to have been undermined by the later decision of *Miranda* v. *Arizona* (1966), *supra,* 384 U.S. 436. (*Groshart* v. *United States* (9th Cir. 1968) *supra,* 392 F.2d 172.)[6]

---

but can only use it circumstantially against her to try and attempt to——'

·'THE COURT: To offset alleged perjury testimony on some other proceeding not related to the one in which the statement was made. [ ¶ ] I agree with you. I am going to require here a showing of voluntariness with reference to statements made as to the condition of her arms. [ ¶ ] I am going to permit that [observation of arms] to come in under any circumstance, I mean, irrespective of voluntariness, but as to statements, there must be a sufficient foundation as to voluntariness, *not however, consisting of compliance with Dorado.*'' (Italics added.)

After further questions on the issue of voluntariness were put to the witness, the court over defense counsel's objection ruled, ''The Court rules that the statements have been shown to have been made voluntarily.''

[6]Note: *The Impeachment Exception to the Exclusionary Rules,* 34 U. of Chi. L.Rev. 939, 950 (1967): ''The impeachment exception as defined in *Walder* [347 U.S. 62] represents a definite chink in the armor of the exclusionary rules. While it may justifiably be used to bring in physical evidence not directly related to the crime charged, *Miranda* and *Escobedo* indicate that any use of illegally obtained pretrial statements will be prohibited. In any event, evidence directly related to the crime

 As the court pointed out in *People* v. *Haston, supra,* the statements with reference to the charge pending when the statements were obtained amounted to a confession, but as used collaterally they take on the nature of an admission only. Hence, we must proceed to determine whether the error was prejudicial and harmful in light of *Chapman* v. *California* (1967) *supra,* 386 U.S. 18, standards.

 As the People are "the beneficiary of a constitutional error," it is incumbent upon the Attorney General "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman* v. *California* (1967) *supra,* at p. 24 [17 L.Ed.2d at p. 710].)

 The testimony of Sergeant Loeber as to defendant's scabs and scar tissues caused by narcotics injections and her admissions as to the use of heroin were pivotal in resolving the direct conflict in the testimony of the People's percipient witness and that of the defendant and her corroboration witnesses. (Cf. *Stoner* v. *California* (1964) 376 U.S. 483, 490, fn. 8 [11 L.Ed.2d 856, 861, 84 S.Ct. 889].)

The prosecution's percipient witness, Charlie Clayborn, testified as follows: On November 24, 1965, he was an undercover police officer of the City of Los Angeles assigned to "Central Narcotics." At approximately 10:15 a.m. on that date, he went to 650 East Flower Street in Venice, California, accompanied by a Charles Robinson. Robinson was an undercover contact who had a state prison record for a narcotics conviction. Upon arrival at 650 East Flower Street, Robinson knocked on the door. Defendant opened it. Robinson asked if Sam was at home. Defendant replied, "Yes."

Robinson and Officer Clayborn entered the house and then proceeded toward the back. Defendant asked, "Where are you all going?" Robinson replied, "To see Sam." Defendant then took a ten dollar bill, which Robinson was holding folded between his fingers, and went to the door to the left of the living room and then went to another door which she opened. She placed her arm through that doorway. She then returned and handed Robinson one yellow balloon, which Robinson in turn handed to Officer Clayborn.

Officer Clayborn put the balloon in his pocket and he and

___

charged should not be permitted before the jury under the thin veil of impeachment. The possibility of improper prejudice to the merits of defendant's case, the deterrent effect on his willingness to testify, and the incentive provided to the police to act unlawfully are losses to the judicial system which greatly outweigh the possible gains from the unmasking of perjury."

Robinson left the premises. After dropping Robinson off, Officer Clayborn returned to the police administration building. There, he opened the balloon, found that it contained a white powdery substance, and booked it into evidence. It was stipulated that the white powdery substance booked by Officer Clayborn was heroin.

Officer Clayborn testified that he had seen the defendant on to previous occasions namely on the 22nd and 23rd of November 1965. On the 22d, he and Robinson had gone to the premises to purchase narcotics. A Sam Allen let them in. Through a door opening he observed defendant was in bed in a bedroom into which Sam Allen went. Sam Allen got a bag of balloons from the headboard of that bed. He took one out and handed it to Robinson in the bedroom. Officer Clayborn on that occasion handed the money to pay for the balloon and contents to Allen. Defendant did not appear to be asleep.

Again on November 23d, Robinson and Officer Clayborn had gone to the premises. Defendant answered the door. Robinson asked if Sam were at home. Defendant replied that Sam was in the den. He and Robinson then walked towards the back of the house through several rooms. They found Sam Allen seated on a sofa in a back room. Later, defendant entered the room and gave milk or some other liquid to Sam Allen.

The defendant testified to the following: the first time she ever saw Officer Clayborn was on December 28th, the day she and Sam Allen were arrested. She had never seen him before that date, nor had she ever admitted him into the house. On the 28th of December, Officer Clayborn dressed in street clothes came and inquired if Sam was at home. She replied, ''Yes.'' Officer Clayborn then said, ''Well, I have been here with Charles [Robinson]. I want to talk to him.'' So defendant let him in.

Sam Allen was in the backyard. Officer Clayborn sat in a chair by the door. When Sam came through the kitchen, defendant told him that Officer Clayborn wanted to talk to him.

Sam told Officer Clayborn, ''I told you never to come here again.'' Sam got mad at defendant for letting Officer Clayborn into the house. Sam told Officer Clayborn, ''I told you I didn't sell no dope'' and to stop coming to the house and asking for it with or without Charles. He took Officer Clayborn by the arm and put him out the door. Clayborn then signalled the other officers who came in and arrested them.

Defendant testified that she has never sold narcotics **to**

Officer Clayborn or Charles Robinson, or to anyone else. She does not recall being in bed and noticing Officer Clayborn from the hall, nor does she recall being in the den and bringing any juice or milk to Sam Allen in the presence of Officer Clayborn. She had seen Charles Robinson only a couple of times within the past year, and never at the house. Two other girls were living in the house in November, both about the same size as defendant, one with reddish-brown hair and the other with blonde hair.

Defendant further testified that she has never seen balloons like the balloon introduced in evidence at the trial, nor has she observed any small balloons tied and knotted in like fashion around the house. She does not use narcotics and has never used narcotics. She denied that she had ever injected any substance into her arm or any other part of her body. Asked, whether she would object to an examination of her arms by an experienced police narcotics officer, she replied, "No, I guess not."

The foregoing testimony of the defendant was supported by Sam Allen and an Albert Sanchez who testified in consonance with defendant's version of her contacts (or lack thereof) with Officer Clayborn and Charles Robinson. Robinson, called as a witness by the defense, invoked his privilege under the Fifth Amendment.

"Under these circumstances, it is completely impossible for us to say that the State has demonstrated, beyond a reasonable doubt," that Sergeant Loeber's testimony "did not contribute to" defendant's conviction. (*Chapman* v. *California* (1967) *supra*, 386 U.S. 18, 26 [17 L.Ed.2d 705, 711] ; see also *People* v. *Ross* (1967) 67 Cal.2d 64, 76-86 [60 Cal.Rptr. 254, 429 P.2d 606] [dissent by Chief Justice Traynor], judgment of conviction reversed *sub nomine Ross* v. *California* (1968) 319 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850].)

The judgment is reversed.

Kaus, P. J., concurred.

Stephens, J., I concur in the result only.

Respondent's petition for a hearing by the Supreme Court was denied November 20, 1968.